**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Louis I. GORDON, Eduardo Jose Garcia, Jeffrey Mark Berg, James M. Cowen, and Eric Theodore Lubov, Defendants-Appellants.**

**No. 77–5831.**

United States Court of Appeals,
Fifth Circuit.

Sept. 22, 1978.

Rehearings Denied Oct. 26, 1978.

Alan I. Karten, Miami, Fla., for Gordon.

Robyn J. Hermann, Asst. Federal Public Defender, Miami, Fla., for Garcia.

Thomas F. Almon, Miami, Fla., for Cowen.

Corey E. Hoffman, South Miami, Fla. (Court-appointed), for Lubov and Berg.

Jack V. Eskenazi, U. S. Atty., Michael P. Sullivan, Ralph N. Person, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before COLEMAN, GEE and HILL, Circuit Judges.

COLEMAN, Circuit Judge.

Berg, Lubov, Garcia, Cowen, and Gordon appeal convictions for violating the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* The one-count indictment charged that they conspired to manufacture methaqualone, a schedule II non-narcotic controlled substance, in violation of 21 U.S.C. § 846 (conspiracy to violate 21 U.S.C. § 841) and 18 U.S.C. § 2 (aiding and abetting).

The defendants advance several grounds for reversal: (1) the affidavit for a search warrant alleged insufficient facts to sustain the magistrate's finding of probable cause; (2) the trial court erred in allowing the indictment to be amended without resubmitting it to the Grand Jury; (3) defend-

ants' motions for judgment of acquittal should have been granted; (4) the defendants were denied due process by the refusal of the trial court to suppress the testimony of a government chemist and; (5) the delegation of authority to schedule, deschedule, and reschedule controlled substances from Congress to the Attorney General and thence to the Drug Enforcement Administration (DEA) is unconstitutional. We affirm.

## I

### The Facts

On December 3, 1976, Sherwin Williams Chemical Company received an order for 750 pounds of anthranillic acid, subsequently confirmed by a written letter, dated December 6, 1976, signed by Berg, using the alias "Arnold Davis". The order for anthranillic acid was sent to Wally's Refinishing Company (also a fictitious name), located in an otherwise unoccupied warehouse in Miami.

On December 6, Berg, again using the Davis alias, purchased a cashier's check at the Florida National Bank at Coral Gables, payable to "Sherwin Williams Chemicals".

That same day, Berg, again using the Davis alias, sent a written order to MCB Manufacturing Chemists, confirming his previous order for 450 pounds of ortho-toluidine and 980 pounds of acetic anhydride. This order, too, was shipped to the fictitious Wally's Refinishing Company at the Miami warehouse address.

On January 3, 1977, two DEA agents made a "controlled delivery" of the Sherwin Williams order. The warehouse contained no tools, equipment, or furniture but did contain a large quantity of denatured alcohol and a box of caustic soda. Berg and Lubov were present, introducing themselves to the agents as "Arnie Davis" and "Joseph Walsh", respectively. Lubov, using his Walsh alias, signed the invoice. Although this chemical was supposed to be used for

metal refinishing, Lubov told the agents that he had no idea how to use it in a metal refinishing process and inquired when the MCB shipment of "drugs" was due.

On January 4, Agent Mantyla, one of the two DEA agents that had made the January 3 delivery, delivered the MCB order. Berg, using his Davis alias, signed the invoice.

The next day Lubov was observed driving around one particular vicinity for fifteen or twenty minutes "up and down, U-turning, this sort of thing" and then stopped near the Air Mac Equipment Company, where he picked up an object that appeared to be a scuba tank, which he carried to the warehouse.

On January 6, Lubov, using his Walsh alias, placed an order with the Biscayne Chemical Company for some chemicals and laboratory equipment. Lubov used a fictitious address on this order.

Two DEA agents made a third delivery to the warehouse on February 10, completing the MCB order of ortho-toluidine. The warehouse remained empty with the exception of the chemicals previously delivered by the DEA agents plus a box marked "Biscayne Chemical Company".[1] This time Lubov and Cowen were present. Subsequent to the delivery, both defendants left the warehouse in separate cars, driving in different directions. A DEA agent followed Cowen to his residence in Coconut Grove. Lubov's car was already parked in front of Cowen's place.

On February 17, Cowen, Gordon and Garcia apparently transferred the chemicals and equipment from the warehouse to a house at 810 Capri Street, Coral Gables, rented by Cowen posing as "James Bloodworth". Cowen drove a U-Haul truck to the warehouse, followed by Gordon and Garcia in a car. The truck was backed into the warehouse. After thirty minutes they left the warehouse and drove to Capri Street. A DEA agent followed the defend-

---

1. The record is unclear as to whether the denatured alcohol and caustic soda were still present in the warehouse.

ants from the warehouse and noted that they drove in an evasive manner:

> During this time, they would be traveling with the flow of traffic eastbound; suddenly the truck or the car would stop, pull to the shoulder, allow traffic to pass and pull back into the flow of traffic.

> At other times, they would go into residential areas and circle the block three or four times; the truck going in one direction, the vehicle going in a separate direction.

> This also included going down alleyways, making U-turns.

Transcript at 156.

Upon their arrival at Capri Street Gordon and Garcia directed the truck into the garage. Cowen then began rolling barrels down a ramp while Gordon and Garcia balanced the barrels so that they would not fall off. The barrels were then placed in the garage. The windows of the garage had been painted over.

That afternoon Cowen and Gordon visited several commercial establishments.[2] They purchased buckets and plastic tubes at a hardware store.

At approximately 6:30 that evening Cowen returned the U-Haul truck to a service station. Garcia met Cowen at the service station and drove him back to Capri Street.

Maintaining surveillance of the defendants, the DEA agents that evening followed Cowen from his Coconut Grove residence to an apartment occupied by Berg and Lubov. Upon his arrival, Cowen knocked and was admitted. Gordon also was followed to a Miami Beach restaurant. The agent following Gordon noted that he was wearing a wig. Gordon and an unknown individual left in separate cars and were observed making U-turns and driving around blocks.

On the morning of February 18 Gordon was followed to Capri Street. He walked several houses past the Capri Street residence, turned around, and then entered the house. The agent following Gordon noted that he was looking in all directions the entire time.

Garcia left the Capri Street residence on two occasions that day. The agent following Garcia observed that he was constantly driving in an evasive manner.

On the evening of February 18, 1977, approximately a month and a half after the DEA surveillance began, DEA agents obtained and executed search warrants on the Capri Street and warehouse properties. The warehouse was completely empty. Garcia was present at the Capri Street residence. The only furniture in the house was a couch and a chair found in the living room. All of the windows were completely covered with blankets, sheets, covers, or paint. Chemicals and equipment were found, unpacked, in the bedroom and bathroom. No contraband, notes, or formulae were found. No chemical reactions were in progress.

## II

### Probable Cause to Search

The defendants submitted motions to suppress, contending that the affidavit for the search warrant did not contain information enough to establish probable cause. It is now argued that the trial court erred in denying the motions. We must disagree. Of course, "probable cause" means something more than "mere suspicion", *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause requires the existence of facts " 'sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed" and the person to be arrested [or searched] committed it, *Id.*

A bright line cannot always be drawn between "mere suspicion" and probable cause. The distinction is more difficult when the suspect is in possession of materials which, in and of themselves, are not unlawful but which can be used for the accomplishment of an unlawful purpose. The impartial magistrate, however, is not required to focus with tunnel vision solely on possession but, obviously, may consider all relevant surrounding facts and circum-

---

2. They also went to a plumbing store, a welding shop, and a Sears store.

stances such as the means by which a controlled substance may be manufactured and conduct reasonably indicating an intent to engage in unlawful activity.[3]

The affidavit submitted in support of the search warrant was based primarily upon the direct personal observations of DEA agents. There was more than sufficient information in the affidavit upon which to conclude that the defendants were involved in something more than a mere innocent storing of chemicals. In addition to chemicals, the defendants procured laboratory equipment indicating that they intended to use the chemicals rather than store them. In ordering the chemicals and some of the laboratory equipment fictitious names and a fictitious address were used.

The DEA received information from Sherwin Williams Chemical Company that one of the defendants stated that the chemicals were intended for use in a refinishing process. Of course, use of these chemicals in a refinishing process would have been legal but additional observations indicated that the defendants did not intend to use these chemicals for that purpose. Sherwin Williams Chemical Company informed the DEA that they were unaware of a refinishing use for the chemicals ordered by the defendants. Furthermore, although the defendants purported to be engaged in the refinishing business, the warehouse contained no tools, no equipment, and no furniture. The only items present were three drums of denatured alcohol and other small boxes.

The chemicals ordered from Sherwin Williams Company and from MCB were known by the DEA to be essential ingredients in the manufacture of methaqualone. The DEA also was aware that the defendants would need both a ventilation and a source of heat in order to manufacture methaqualone. Neither facility was available at the warehouse, hence the motive for the removal to the house on Capri Street, which would make the manufacture possible.

Additional factors were, Lubov's inquiry concerning a shipment of "drugs", the use of a fictitious business name and address, the storage of equipment and a large quantity of chemicals in a house rather than in a business building, painted garage windows at the Capri Street residence, and the evasive driving employed by the defendants in transferring the supplies from the warehouse to Capri Street.

In short, applying the lessons of common, everyday experience to the known facts, which the magistrate was entitled to do, the conduct of the parties and the manipulation of the supplies were bereft of the first earmark of a legitimate operation, being, instead, shot through and through with every indication of an illegal purpose. It would have been indeed surprising had the magistrate denied a search warrant after considering the averments of the affidavit. The attack on the validity of the search warrant is frivolous.

## III

### Sufficiency of the Evidence

■ In determining the sufficiency of the evidence to support a conviction, all the

---

3. Some relevant cases are United States v. Martin, 9 Cir., 1975, 509 F.2d 1211 (probable cause for warrantless arrest when chemicals and equipment purchased; evasionary driving tactics; late working hours; consciousness of guilt, and; late evening transfer of jug appearing to contain controlled substance), cert. denied, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975); United States v. Smith, 7 Cir., 1974, 499 F.2d 251, 253, 255 (probable cause for search warrant when clandestine laboratory in operation; chemicals and equipment purchased, and; shades drawn); United States v. Welebir, 4 Cir., 1974, 498 F.2d 346 (probable cause for search warrant when large quantity of chemical precursors purchased; defendant had scientific background to manufacture illicit drugs; tip that defendant intended to operate clandestine laboratory; and, chemical orders detected); United States v. Noreikis, 7 Cir., 1973, 481 F.2d 1177 (probable cause for search warrant when thirteen chemicals used in manufacture of illicit drug present in defendant's residence), cert. denied in part and judgment vacated in part on other grounds, 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974); United States v. Moore, 6 Cir., 1971, 452 F.2d 569, 572 (probable cause for search warrant when precursors delivered to "maildrop"; use of fictitious names; unusual working hours, and ether detected), cert. denied, 407 U.S. 910, 92 S.Ct. 2435, 32 L.Ed.2d 684 (1972).

evidence and reasonable inferences therefrom must be viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Where, as here, convictions are based entirely upon circumstantial evidence, the appellate issue is whether a jury of reasonable individuals could conclude that the " 'evidence is inconsistent with the hypothesis of the accused's innocence' ", *United States v. Marable*, 5 Cir., 1978, 574 F.2d 224, 228–29 and n. 1, and cases cited therein; *United States v. Alonzo*, 5 Cir., 1978, 571 F.2d 1384, 1387. An examination of the record in total context reveals that the trial judge applied this standard. The inquiry is whether evidence was presented from which a jury could conclude that a conspiracy existed, that each defendant knew of the conspiracy, and with that knowledge voluntarily joined it, *United States v. Littrell*, 5 Cir., 1978, 574 F.2d 828, 832.

### A. *Conspiracy*

■■ Ordinarily, the essential elements of a conspiracy are an agreement by two or more persons to commit an offense against the United States and an overt act by one of them in furtherance of the conspiracy, *United States v. White*, 5 Cir., 1978, 569 F.2d 263, 266, but no showing of an overt act is required in prosecutions under 21 U.S.C. § 846, *United States v. Pringle*, 5 Cir., 1978, 576 F.2d 1114, 1120; *United States v. Johnson*, 5 Cir., 1978, 575 F.2d 1347, 1366; *United States v. Thomas*, 5 Cir., 1978, 567 F.2d 638, 641; *United States v. Palacios*, 5 Cir., 1977, 556 F.2d 1359, 1364 n. 9. Nevertheless, by direct or circumstantial evidence, the evidence must demonstrate that there was an agreement to manufacture methaqualone in violation of the Com-

prehensive Drug Abuse Prevention and Control Act of 1970.

■ We think the government met this burden, to the exclusion of every reasonable hypothesis of innocence. First and foremost, glaringly so, there is a total absence of personal conduct or operational method which a reasonable minded person would associate with individuals motivated by innocent intent. The habitual use of aliases, the employment of fictitious addresses, the clandestine shifting and concealed storage of chemicals which could be used for the manufacture of methaqualone, and the palpable absence of anything ordinarily encountered in a legitimate business operation were blatant badges of illicit intent which no reasonable person could ignore or mistake for signs of innocence.

Lubov and Berg attempted to explain their secretive behavior by the testimony of Robert Klein, who employed them both as insurance salesmen and managers. Klein explained that there was a company rule prohibiting managers from holding any other employment. Violation of that rule would result in the discharge of the violator. Assuming that the jury accepted this testimony at face value, as far as it went, they were not compelled to accept it as the only reason behind the activities of Lubov and Berg.

The ultimate question is whether a reasonably minded jury could identify the manufacture of methaqualone as the specific illegal object of the concerted activities. The record requires an affirmative answer.

Dr. Hanel, a DEA chemist, testified for the government that he had manufactured methaqualone by using three of the seven chemicals seized from the defendants[4] and by using equipment that was similar to the

---

**4.** The following chemicals were seized from the house on Capri Street: (1) 750 pounds of anthranillic acid; (2) 59 gallons of ortho-toluidine; (3) 32 pounds of "toluidine" (apparently this was the second shipment of ortho-toluidine from MCB); (4) 110 gallons of acetic anhydride; (5) 165 gallons of denatured alcohol; (6) 80 pounds of hydrochloric acid; (7) 1 quart of muriatic acid (a less purified substance than hydrochloric acid); (8) 100 pounds of sodium

hydrochloride; (9) 2 pints of benzene, Record at 134 (Search Warrant Return). The government's testimony was that it used anthranillic acid, ortho-toluidine and acetic anhydride to manufacture methaqualone.

The search warrant return listed nine chemicals as having been seized. We have referred to only seven chemicals, however, because of the similarity between certain of the chemicals.

equipment seized from the Capri Street residence. This was true despite the fact that Dr. Hanel was unable to use two of the seized chemicals (present in sizeable quantities) under his method of manufacturing methaqualone and, further, that some of the seized chemicals could be used to produce a compound consistent with an industrial purpose. Nonetheless, based on all of the chemicals and equipment seized, Dr. Hanel observed "I don't know what else they could make. I mean, that would be of consequence", Transcript at 403.

On the other hand, Dr. Cornette, a defense chemist, testified that all of the chemicals and equipment seized was consistent with an industrial laboratory, although he candidly observed that the defendants were lacking some necessary equipment in this respect.

It was within the province, indeed the duty, of the jury to resolve any conflicting testimony, to determine whether to believe a particular witness, and to decide the inferences reasonably to be drawn from credible testimony offered at trial, *United States v. Orzechowski*, 7 Cir., 1977, 547 F.2d 978, 981–83; *United States v. Ducker*, 5 Cir., 1974, 491 F.2d 1190.

It is a basic fact that conspirators do not go about proclaiming their purpose and intent; hence it has always been held that such may be inferred from what individuals have done, considering the relevant facts and circumstances under which they did it.

It is our view that the evidence in this case amply supported the verdict of the jury that the conspiracy existed, as charged.

### B. *Individual Participation in the Conspiracy*

It is, of course, fundamental that in order to establish participation in a conspiracy the government must show more than mere presence or association, *United States v. Littrell*, 5 Cir., 1978, 574 F.2d 828, 833. There must be evidence that the individual defendant had knowledge of the conspiracy and with that knowledge voluntarily joined the conspiracy, *United States v. Littrell,*

*supra*, at 832; *United States v. Marable*, 5 Cir., 1978, 574 F.2d 224, 229.

Because all three were directly involved in key transactions in the recited course of events, there can be no doubt that Berg, Lubov, and Cowen were members of the conspiracy. Berg was responsible for procuring the chemicals, he was present when two shipments of these chemicals were received, and accepted the delivery of one such shipment by signing the invoice, always hiding behind an alias. Lubov was present during all three deliveries of the chemicals, signed the invoices for two such shipments, and, further, purchased other chemicals and equipment that could be used in the manufacture of methaqualone, likewise using his alias.

Cowen was present during the delivery of one of the chemical shipments, purchased equipment that could be used in the laboratory, rented the Capri Street house when he already resided in a nearby apartment, and transferred the supplies from the warehouse to the Capri Street house.

That Berg and Lubov were never observed at the Capri Street residence does not command their exoneration. It was a part of the total picture to be evaluated by the jury. A conspirator need not be involved in every transaction comprising the conspiracy and need not work with every member of the conspiracy in order to be convicted, *United States v. James*, 5 Cir., 1978, 576 F.2d 1121, 1124, 1126. Without a doubt, the operations at the warehouse, for which Berg and Lubov were primarily responsible, were connected with those at Capri Street. Berg and Lubov are further linked to the Capri Street end of the conspiracy by their association with Cowen who was the chief actor in the Capri Street operations.

We next consider the cases of Gordon and Garcia.

On February 17, Gordon and Cowen drove separate vehicles to the warehouse. Garcia rode with Gordon. At the warehouse, Gordon and Garcia opened the garage doors to enable Cowen to back in his

U-Haul truck. All three individuals remained inside the warehouse for thirty minutes and then drove to Capri Street with the warehouse supplies in Cowen's truck. During the course of this transfer Gordon operated his car as a counter-surveillance vehicle for Cowen. Upon their arrival at Capri Street, Gordon and Garcia assisted Cowen in backing up his truck to the garage. Ramps were then placed from the back of the truck to the garage. Cowen unloaded the supplies from the truck while Gordon and Garcia balanced them to prevent their falling. Gordon and Cowen went on a "shopping spree" and purchased certain equipment that could be used in the laboratory. Garcia picked Cowen up at a service station after Cowen returned his U-Haul truck there. Embarrassingly enough, Garcia was in the Capri Street residence when the search warrant was executed.

The evidence supports the conviction of all five defendants.

## IV

### The Destruction of the Experimentally Produced Methaqualone

An important element of the government's case was the testimony of the DEA chemist, Dr. Hanel, that methaqualone could be and, in fact, had been manufactured by using three of the chemicals seized and laboratory equipment similar to that found at Capri Street. The methaqualone he had produced had been destroyed immediately. There is no indication that the government had an improper motive for destroying the methaqualone. As a result of this destruction, samples of the methaqualone so manufactured were not made available to the defendants and could not be introduced at the trial. However, the government did make available samples of the three seized chemicals that the government had used in producing the methaqualone.

The defendants first learned that the government produced methaqualone by using three of the chemicals seized at a June 13, 1977, hearing before a magistrate concerning the destruction of items that had been seized. The government was ordered to disclose the formula to the defendants. After unsuccessfully appealing the production order to the trial court, the government produced the formula on September 30, 1977, two weeks before trial. By this time, the defendants had used up their samples of the three essential chemicals originally seized by the agents.

On the afternoon of the second day of trial the defendants objected to testimony about the experiment conducted by Dr. Hanel. This objection was made prior to Dr. Hanel's taking the stand. Following a lengthy discussion between counsel and the trial court, the motions to exclude Dr. Hanel's testimony that he had manufactured methaqualone were denied. The trial court concluded that the defendants would not be improperly prejudiced by Dr. Hanel's testimony, reasoning that since the defendants had samples of the essential chemicals and of the formula they could determine on their own, with the aid of their chemist, whether methaqualone could be produced and, further, that the defendants would be able to effectively cross examine Dr. Hanel as to the procedures he followed to determine whether he could have actually produced methaqualone, Transcript at 351–353. The trial court also ruled that exclusion of Dr. Hanel's testimony was not required because the government had destroyed the methaqualone and therefore was no longer in "possession" of the substance within the meaning of F.R.Crim.P. 16(a)(1)(C).

■ It is now contended that the failure of the trial court to exclude Dr. Hanel's testimony regarding his experiments offended Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure, the due process clause of the Fifth Amendment and the confrontation clause of the Sixth Amendment.

We think that the product of Dr. Hanel's experiment was clearly discoverable under

the specific terms of Rule 16(a)(1)(C)[5] and that the material instead of being destroyed should have been submitted for inspection. At the same time, it is equally clear that the destruction of the controlled substance was done in good faith, not for the purpose of inflicting a disadvantage upon the defendants.

The crucial issue, then, is whether the lack of the experimentally produced methaqualone requires reversal because it would have been "likely to have changed the verdict", *Armstrong v. Collier*, 5 Cir., 1976, 536 F.2d 72, 77 (there dealing with an alleged violation of constitutionally guaranteed due process). Or, as the Supreme Court put it in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), did the absence of Dr. Hanel's product have any reasonable likelihood of affecting the judgment of the jury? An important factor to be considered in resolving that question is whether the evidence was "crucial to a determination of the guilt or innocence of the accused", *United States v. Hildebrand*, 5 Cir., 1975, 506 F.2d 406.

If the defendants had been on trial for the actual manufacture of methaqualone and none of their own product had been seized and analyzed it might reasonably be said that the experimentally produced controlled substance was indeed crucial. The defendants were on trial, however, for *conspiring* to manufacture. In such a case, since no overt act is required, they could have so conspired although they had been entirely mistaken in the belief that the materials they had would actually do the job.

Moreover, the failure of the government chemist to produce what he claimed to have manufactured could well have militated against his credibility.

The defense chemist, Dr. Cornette, testified that he had the necessary chemicals and equipment in his own laboratory with which to have conducted the Hanel experiment. Indeed, Dr. Cornette testified that he had experimented with the Hanel formula, submitted under protest by the government, and that it could not successfully be used for the manufacture of methaqualone. The government was then caught without the Hanel product which could have been submitted to a disinterested expert to verify its authenticity. The affair was thus reduced to a credibility contest between Hanel and Cornette, and Hanel had to testify without the one thing which could have elevated what he said to an almost irrefutable status. The jury could and did resolve the conflict (if it had any real affect on the verdict). We conclude, therefore, that if anybody suffered any prejudice from the absence of the experimentally manufactured methaqualone it was the government and that this aspect of the trial was not reasonably likely to have affected the verdict in a manner prejudicial to the defendants. Consequently, it provides no adequate ground for the reversal of these convictions.

The government chemist was on the witness stand, duly confronted, and cross-examined. There is no merit in the argument that the absence of the methaqualone denied the defendants a Sixth Amendment right, *United States v. Herndon*, 5 Cir., 1976, 536 F.2d 1027; *United States v. Williams*, 5 Cir., 1971, 447 F.2d 1285, 1288, 1291 (*En Banc*).

## V

### *Delegation*

The defendants urge that the Comprehensive Drug Abuse Prevention and Control Act of 1970 unconstitutionally delegates the power to define otherwise legal activity as criminal to the United States Attorney General where it has been, in turn, delegat-

---

**5.** Federal Rules of Criminal Procedure, § 16(a)(1)(C) provides:

Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

ed to the DEA. The defendants contend such delegation and sub-delegation is constitutionally impermissible on two grounds. First, certain relevant standards provided in the Act are unconstitutionally vague. Second, the delegation complained of violates the doctrine of the separation of powers by vesting the power to define crimes with the prosecutor.

The Act established five schedules of controlled substances, 18 U.S.C. § 812(a). Congress initially listed the substances to be placed on these schedules, *Id.* at § 812. In addition, the Act provides the Attorney General with the authority to schedule, transfer between schedules, or remove any drug or substance from a schedule in accordance with statutory procedures and criteria, *Id.* at § 811. Thus the Attorney General may, by rule, schedule or reschedule a drug if he

(A) finds that such drug or other substance has a potential for abuse, and

(B) makes with respect to such drug or other substance the findings prescribed by subsection (b) of section 812 of this title for the schedule in which such drug is to be placed.

*Id.* at § 811(a).

Section 811(a) "control" proceedings must be in accordance with the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* After gathering the necessary data but before initiating "control" proceedings under § 811(a), the Attorney General "shall" request a scientific and medical evaluation and recommendation whether a drug should be controlled from the Secretary of Health, Education and Welfare, *Id.* at § 811(b). The Secretary's recommendation "shall be binding" on the Attorney General with respect to scientific and medical matters and the Attorney General shall not control a drug if the Secretary so recommends. After receipt of the Secretary's report, the Attorney General "shall" initiate proceedings for control of a drug under § 811(a) if he determines that there is substantial evidence of a "potential for abuse such as to warrant control . . ..", *Id.* at § 811(b).

In determining whether to control a particular drug under § 811(a), the Attorney General "shall consider" certain criteria provided in § 811(c). The Act further provides criteria which must be met for the particular scheduling of a drug once it is determined that such drug should be controlled, *Id.* at § 812(b).

The Attorney General's authority under the Act was transferred to the DEA in 1973 pursuant to Executive Order No. 11727, 38 Fed.Reg. 18357 (1973).

The placement of a drug on a particular schedule will determine under what circumstances such drug can be manufactured, distributed, and used, *see Id.* at §§ 823–829 and, of particular importance here, the penalties for unauthorized manufacture, distribution, or possession, *Id.* at §§ 841(b)–848.

On two previous occasions delegation under the Act has been attacked in this Court. In *United States v. Jones,* 5 Cir., 1973, 480 F.2d 954, *cert. denied,* 414 U.S. 1071, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973), it was argued that statutory procedures for reclassification of controlled substances was unconstitutionally vague. We declined to resolve this issue because the defendants were charged with violations of the Act involving marijuana, a substance placed on the schedules by Congress and not reclassified by the Attorney General, *Id.* at 960. In *United States v. Westlake,* 5 Cir., 1973, 480 F.2d 1225, we similarly declined to reach the issue whether the Act impermissibly delegated the power to reschedule drugs to the Attorney General when the defendants were charged with illegally importing cocaine, a drug initially scheduled by Congress and not subsequently rescheduled by the Attorney General, *Id.* at 1226.

In the case *sub judice,* on the other hand, the defendants were charged with conspiring to manufacture methaqualone. Methaqualone was not initially scheduled by Congress in 1970 but rather was scheduled by the Administrator of the DEA in 1973, 38 Fed.Reg. 27519; 28 C.F.R. 1308.-13(2)(1) (1973). We must therefore determine whether the authority under which the DEA scheduled the methaqualone was impermissibly delegated.

## A. *Standards*

The defendants contend that the delegation of authority to schedule drugs is unconstitutional because the standards provided in 21 U.S.C. §§ 811 and 812 are so vague and inadequate as to render a conviction for activities involving a drug scheduled pursuant to that delegated authority violative of due process. Specifically, the defendants point out that the "potential for abuse" finding which is a prerequisite to scheduling a drug under 21 U.S.C. § 811(a), 811(c) is nowhere defined in the Act.

■ The federal constitution provides that "[A]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives", United States Constitution, Art. 1, § 1. Congress may not abdicate or transfer to others the essential legislative functions with which it is thus vested, *Schechter Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Company v. Ryan*, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446 (1935). On the other hand, the federal constitution does not deprive Congress of

> necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.

*Panama Refining Company v. Ryan, supra; Schechter Corp. v. United States, supra*, 295 U.S. at 530, 55 S.Ct. 837.

Thus, Congress is permitted to authorize other bodies to determine specific facts and may also establish general standards and delegate to others the responsibility of effectuating the legislative policy, *Schechter Corp. v. United States, supra; Panama Refining Company v. Ryan, supra*, 293 U.S. at 426, 55 S.Ct. 241.

■ Ordinarily, the standards provided by Congress in delegating power may be broad, *United States v. Robel*, 389 U.S. 258, 274, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (Brennan, J. concurring); *Carlson v. Landon*, 342 U.S. 524, 542, 543, 72 S.Ct. 525, 96 L.Ed. 547 (1952). This is so because Congress is only required to legislate so far as "reasonable and practicable". *Carlson v. Landon, supra*, at 542, 72 S.Ct. 525. Therefore, when considering an attack on congressional delegation, we must not only examine the entire Act to determine what standards, if any, have been provided but also whether such standards are sufficiently definite in light of the complexity of the area at which the legislation is directed and the susceptibility to change of the area in question, *Carlson v. Landon, supra*, at 542, 544, 72 S.Ct. 525; *see Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

Two circuits have faced the delegation issue now before us. Both circuits have concluded that the standards provided in the Act are not impermissibly vague.

In *United States v. Pastor*, 2 Cir., 1977, 557 F.2d 930, the "potential for abuse" standard was found to be sufficiently precise in light of the numerous other standards provided in the Act and the detailed legislative history relating directly to the "abuse" standard, *Id.* at 941. In addition the *Pastor* Court observed that the delegation is made "pursuant to a clear statement of Congressional policy" and thus the standards are consistent with this policy, *Id.* Moreover, they found it important to note that there is a "necessity for speedy, detailed and expert agency action in the area of drug technology", *Id.* Finally, the detailed procedures to be followed in determining whether to control a drug and the availability of judicial review were found to provide more than adequate safeguards against arbitrary action by the Attorney General, *Id. Pastor* was followed in *United States v. Friedman*, 2 Cir., 1977, 558 F.2d 1125, where the defendant was convicted of offenses under the Act involving methaqualone.

In *United States v. Davis*, 9 Cir., 1977, 564 F.2d 840, *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978), the Act

was found to contain "sufficient guidelines and standards" in light of the numerous factors that must be accounted for under the Act before a drug may be controlled and, further, in light of the protections of the Administrative Procedure Act, *Id.* at 844. In reaching this conclusion, the *Davis* Court relied on the discussion of the district court in *United States v. Piatti*, E.D., N.Y., 1976, 416 F.Supp. 1202. There the defendant was convicted of offenses of the Act involving methaqualone. After reviewing the elaborate procedure mandated by Congress for the control of drugs the *Piatti* Court concluded that the "standards and safeguards prescribed by §§ 811 and 812 would appear to be more than sufficient to meet" the delegation objections raised by the defendant.

■ We agree with the conclusion and reasoning of *Pastor, Friedman, Davis,* and *Piatti.* Although there may be some ambiguity in the Act's standards, we believe these standards are sufficiently precise to apprise the delegatee of the circumstances under which a particular drug may be controlled. Moreover, given the constant changes in the area to be regulated, more precise standards could not be drawn without undermining the Act's purpose. Finally, there are sufficient safeguards against the arbitrary control of drugs.

## B. *Separation of Powers*

The defendants also contend that the delegation under the Act is improper on two additional grounds. First, because the DEA has the power to schedule drugs and thereby define otherwise lawful activity as unlawful, the defendants argue that Congress has impermissibly delegated the authority to legislate. Second, the power to

schedule drugs has been delegated to the very body responsible for enforcement of the Act and therefore, the defendants urge, this concentration of power is inherently unfair.

■ It is well established that a delegatee may formulate rules for violation of which the statute itself provides penalties imposable by judicial process, *Avent v. United States*, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202 (1924); *McKinley v. United States*, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919); *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); L. Jaffe & N. Nathanson, Administrative Law: Cases and Materials (4th Ed., 1976) at 143. We conclude that the authority delegated under the Act is constitutionally permissible, *United States v. Davis, supra*, at 843, 844; *United States v. Piatti, supra*, at 1205, 1206. It is clear that the DEA was provided carefully limited and defined authority under the Act and that Congress, not the DEA, ultimately is responsible for the scheduling of drugs. The defendants' reliance on *Howell v. Mississippi*, 300 So.2d 774 (Miss., 1974) is misplaced.

■ We also conclude that delegation of the authority to schedule drugs is constitutionally permissible. As we have already noted the Act contains sufficient safeguards against arbitrary and, hence, unfair action by the DEA, *United States v. Pastor, supra.*[6] We also note that this is not a case where a law enforcement agency has wide discretion to define what conduct is criminal and the defendant, without notice of what specific conduct would be regarded as unlawful, was forced to act at his peril, *Smith v. Goguen*, 415 U.S. 566, 573, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974);

---

**6.** The *Pastor* Court examined the delegation issue in terms of the delegation from Congress to the Attorney General. The subsequent delegation from the Attorney General to the Administrator of the DEA was not considered. This limited focus does not detract from the value of the analysis in *Pastor.* First, the DEA received no greater authority than that delegated to the Attorney General by Congress. Accordingly, the DEA must act pursuant to the same standards provided in the Act in determining whether to schedule a drug. Second, the subdelegation of power is not inherently invalid. *See Van Blaricom v. Forscht*, 5 Cir., 1975, 511 F.2d 615, 617 (En Banc), *cert. denied*, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975); *F. T. C. v. Gibson*, 5 Cir., 1972, 460 F.2d 605, 606, 607; 28 U.S.C. § 510, cited in *United States v. Nocar*, 7 Cir., 1974, 497 F.2d 719, 723, *cert. denied*, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 315 (1974).

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 165, 169, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Indeed, no contention is made by the defendants that they lacked notice that conspiring to manufacture methaqualone was unlawful. Thus, we are unable to see how the delegation here was unfair in any way.

## VI

### Conclusion

We have examined the remaining issues and conclude that they are without merit.

The convictions of all appellants are AFFIRMED.