ATLANTIS I CONDOMINIUM ASSOCI-
ATION, Appellant Below, Appellant,

v.

John C. BRYSON, Secretary of Depart-
ment of Natural Resources and Environ-
mental Control of The State of Dela-
ware, Appellee Below, Appellee.

Supreme Court of Delaware.

Submitted March 16, 1979.

Decided May 23, 1979.

Robert L. Halbrook, of Wilson, Halbrook, Bayard & Bunting, Georgetown, for appellant below, appellant.

June D. MacArtor, Deputy Atty. Gen., Dover, and James D. Griffin, of Griffin & Hackett, P.A., Georgetown, for appellee below, appellee.

Before DUFFY, McNEILLY and QUILLEN, JJ.

McNEILLY, Justice:

In this appeal from Superior Court, the issues presented are:

(1) Whether the Beach Preservation Act of 1972, 7 *Del.C.* Ch. 68, invests the Department of Natural Resources and Environmental Control (DNREC) with the authority to issue permits regulating residential construction on private beaches in Delaware; and,

(2) If that authority is found to exist, whether it constitutes a lawful delegation of legislative power to the DNREC.

## I

Pursuant to regulations promulgated by the DNREC, Ocean View Properties applied to the Division of Soil and Water Conservation, DNREC, for a permit to build six semidetached condominium apartments on three adjoining, privately owned, beachfront lots, together with a timber bulkhead, to be located seaward of the lots in the primary coastal dune, on State owned property. The initial application was denied and, on appeal to the Secretary of the DNREC, the denial was upheld.

Ocean View Properties modified its plans and submitted a new application for a permit, which the Division granted. The appellant, Atlantis I Condominium Association, appealed the decision to the Secretary of the DNREC.[1] Following a public hearing on the matter, the Secretary affirmed the order granting the permit on the grounds that the modified plans provided a "high degree of protection for the proposed construction and for adjacent properties." The Secretary's conclusion was supported with specific findings of fact.

The appellant then appealed the Secretary's decision to the Superior Court, which affirmed the Secretary's order. Atlantis I Condominium Association now brings this appeal from the order of the Superior Court.

The appellant contends that the permit issued by the DNREC is invalid because the regulations authorizing its issuance are based upon an unconstitutional delegation of legislative power and exceed the authority of the DNREC. The appellant argues that the purposes of the Beach Preservation Act of 1972 (the Act) are too vague and indefinite to constitute a proper grant of authority to the DNREC to adopt regulations governing residential construction on private beach property. The appellant notes that the Act fails to authorize residential construction on private beach property and that it fails to set forth any standards by which the DNREC could enact regulations governing residential construction on private beaches. Thus, the appellant concludes that, absent any specific language in the Act concerning the regulation of residential construction on private beaches, the DNREC has no authority to issue permits allowing such construction.

## II

The Delaware courts have long recognized the necessity for the General Assembly to delegate its regulatory authority to administrative agencies. *See State v. Retowski*, Del.Ct.Gen.Sess., 175 A. 325 (1934); *Hoff v. State*, Del.Super., 197 A. 75 (1938). The difficulties arise in trying " . . . to mark the line which separates the legislative power to make laws from administrative authority to make regulations . . ." *Hoff*, at 79. As Chief Justice Layton so

---

1. Appellant obtained standing to appeal the Division's decision pursuant to the DNREC's *Regulations Governing Beach Protection and the Use of Beaches* § 9. Procedures for review of administrative decisions will be discussed at greater length, *infra*.

aptly stated in *Hoff*, "[T]he true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority and discretion as to its execution, to be exercised in pursuance of the law." *Hoff*, at 79.

The test for determining the validity of a legislative delegation was stated concisely in *State v. Durham*, Del.Super., 191 A.2d 646 (1963):

> "Generally, a statute or ordinance vesting discretion in administrative officials without fixing any adequate standards for their guidance is an unconstitutional delegation of legislative power. But a qualification to that rule is that where the discretion to be exercised relates to police regulation for the protection of public morals, health, safety, or general welfare, and it is impracticable, to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will, the legislation delegating such discretion without such restrictions may be valid. *Adequate safeguards and standards to guide discretion must be found in or be inferable from the statute, but the standards need not be minutely detailed, and the whole ordinance may be looked into in light of its surroundings and objectives for purposes of deciding whether there are standards and if they are sufficient.*" 191 A.2d, at 649–650 (emphasis added); *accord, State v. Braun*, Del.Super., 378 A.2d 640 (1977).

"The basic purpose behind the non-delegation doctrine is sound: Administrators should not have unguided and uncontrolled discretionary power to govern as they see fit." I Davis, *Administrative Law Treatise* § 3:15 (2d ed. 1978). Clearly, unbridled administrative discretion was the primary concern of the Court in *Durham, supra*. That being the case our focus turns toward "the totality of protections against [administrative] arbitrariness, including safeguards and standards", regardless whether those protections are set forth in the legislation itself or in the procedures used by the administrative agency to execute the legislation. *Davis, supra.* Thus, while the existence of statutory standards is relevant in assessing the validity of a delegation of authority, the "totality of protections", including the existence of safeguards, for those whose interests may be affected is determinative. *Meyer v. Lord*, Or.App., 37 Or.App. 59, 586 P.2d 367, 371 (1978); *see also Horner's Market v. Tri-County Trans.*, Or.Supr., 471 P.2d 798 (1970).

Where it is not feasible for the General Assembly to supply precise statutory standards without frustrating the purposes of the legislation, the presence of procedural safeguards may compensate substantially for the lack of precise statutory standards. *State v. Boynton*, Me.Supr., 379 A.2d 994 (1977). The preciseness of the statutory standards will vary with both the complexity of the area at which the legislation is directed and the susceptibility to change of the area in question. *State Conservation Department v. Seaman*, Mich.Supr., 396 Mich. 299, 240 N.W.2d 206, 210 (1976); *United States v. Gordon*, 5 Cir., 580 F.2d 827, 839 (1978); *cf. Durham, supra*, at 650.

In any event, the authority granted to an administrative agency should be construed so as to permit the fullest accomplishment of the legislative intent or policy. An expressed legislative grant of power or authority to an administrative agency includes the grant of power to do all that is reasonably necessary to execute that power or authority. *Kreshtool v. Delmarva Power and Light Co.*, Del.Super., 310 A.2d 649 (1973). Such implied power may include the power to require a license in an appropriate situation where licensing is " . . . incidental, implied, or necessary and proper in light of the objectives and the power granted . . . ." *Carroll v. Tarburton*, Del.Super., 209 A.2d 86 (1965).

## III

Before proceeding to the Act and the accompanying regulations of the

DNREC, we preface our analysis with two guiding principles of statutory construction: That all reasonable doubt must be resolved in favor of the constitutionality of the legislation and that, if a constitutional construction is possible, it should be followed. *See* 2A Sands, *Sutherland Statutory Construction* § 45.11 (4th ed. 1973).

Originally, the General Assembly vested jurisdiction in the State Highway Department to perform work to prevent and repair damage from beach erosion and to impose sanctions for the unauthorized alteration of beach structures within the Department's jurisdiction. 17 *Del.C.* §§ 142, 143 (1970 Cum.Supp., Repealed) (originally enacted as 51 Del.Laws, Ch. 253, effective July 22, 1957).

In enacting the Beach Preservation Act of 1972, the General Assembly elected to transfer jurisdiction of beach erosion control from the Highway Department to the DNREC. 7 *Del.C.* Ch. 68 (originally enacted as 58 Del.Laws, Ch. 566, effective July 22, 1972). But the Act significantly enlarged the jurisdiction of the DNREC to include the "[a]uthority to enhance, preserve, and protect public and private beaches within the State."[2] 7 *Del.C.* § 6803. Implicit in this transfer and enlargement of jurisdiction is the recognition on the part of the General Assembly that beaches are a vital natural resource whose importance extends well beyond their geographic boundaries. Also implicit in the transfer is an acknowledgment by the General Assembly of the expertise of the DNREC and its superior ability to implement a coordinated regulatory program in regard to beaches within the State.

The basic legislative policy statement is found in section 6801 of the Act:

"The purposes of this chapter are to enhance, preserve, and protect the public and private beaches of the State, to prevent beach erosion, to make certain acts destructive of beaches punishable as crimes, to prescribe the penalties for such acts, and to vest in the Department of Natural Resources and Environmental Control ("the Department") the authority to adopt such rules and regulations as it deems necessary to effectuate the purposes of this chapter." 7 *Del.C.* § 6801.

To effectuate this broad statement of policy, the General Assembly invested the DNREC with the following express authority:

"(a) Authority to enhance, preserve, and protect public and private beaches within the State shall be vested solely in the Department of Natural Resources and Environmental Control.

(b) The Department shall prevent and repair damage from erosion of public beaches. To this end, the Department shall, when it deems it necessary, provide, construct, reconstruct, and maintain groins, jetties, banks, dikes, dunes, bulkheads, seawalls, breakwaters, and other facilities or make any other repairs or take any other measures along or upon any public beach or shoreline area in this State. All structures, devices, and facilities existing now or in the future which are devoted to the enhancement, preservation, and protection of beaches shall be under the sole jurisdiction, management, and control of the Department.

(c) No substantial change in the existing characteristics of any beach shall be made without prior written approval of the Department.

(d) No dune buggy, truck, automobile, motorized bicycle, mechanized vehicle or machine shall be operated on any public beach except in accordance with rules and regulations promulgated by the Department.

(e) The Secretary of the Department shall, as soon as practicable, promulgate rules and regulations to effectuate the purposes of this chapter.

(f) The authority of the Department shall extend to privately owned beaches whenever, in the judgment of the Gover-

---

**2.** The term "beach" is defined in 7 *Del.C.* § 6802(1) as "that portion of the shore of any body of water which extends from the mean low watermark inland 1,000 feet, or to a roadway for automobiles, whichever is closer."

nor, such dangerous conditions exist in a location specified by the Governor as to constitute an emergency. Before taking any action with respect to a privately owned beach, the Department shall, whenever practicable, give reasonable notice to the owner thereof that a condition of potential emergency must be corrected, and wait a reasonable period of time for the owner to correct the matter. If the owner does not correct the matter, the Department shall do so." 7 *Del.C.* § 6803.

A perusal of these and other provisions of the Act reveal that it is noticeably devoid of the types of precise "standards" to control administrative discretion which the appellant urges are necessary for a valid delegation of authority. However, as noted earlier, the preciseness of statutory standards will vary according to the complexity of the area dealt with by the legislation and its susceptibility to change. *Seaman, supra; Gordon, supra.* Moreover, precision may be lacking where an attempt to fix the standards would impair the flexibility required to enable the administrative officials to carry out the basic legislative policy. *Durham, supra.* We think the Beach Preservation Act of 1972 presents such a situation.

The Act clearly indicates a recognition by the General Assembly of the problem facing the State in regard to beaches which are rapidly deteriorating due to a combination of both natural processes and continual encroachments by man. But the lack of specific policy standards in the Act, coupled with the general directives to the DNREC "to enhance, preserve, and protect" the beaches and "to adopt such rules and regulations as it deems necessary to effectuate [those] purposes", suggests that the General Assembly also realized its inability to articulate specific policies to alleviate the problem. Rather, the General Assembly was aware of the difficulties in attempting to legislate the specifics of a coordinated beach management plan, and instead, chose to defer to the expertise of the DNREC in that area.

That deference may be found in 7 *Del.C.* § 6803(c) which requires that, "No substantial change in the existing characteristics of *any* beach shall be made without prior written approval of the Department." (emphasis added).

Although the Act does not specify what constitutes a "substantial change" in the characteristics of a beach, the DNREC's regulations define a "substantial change" to include "the erection of any permanent or semi-permanent structure." *Regulations Governing Beach Protection and the Use of Beaches* § 1. That definition is well within the apparent intent of the General Assembly to prevent unrestricted development of beaches and "to effectuate an equitable balance between utilization, conservation and protection of this resource consistent with sound coastal engineering principles." *Regulations*, Statement of Policy.

In order to formalize its authority to grant or deny "written approval" for "substantial change" to a beach, the DNREC promulgated regulations which require permits for certain beach construction.

In the present case, sections 4.01 and 4.02 of the DNREC's regulations are applicable because Ocean View Properties submitted a joint application for both its proposed condominium and appurtenant bulkhead.

Section 4.01 provides essentially that no person shall construct a structure, such as a bulkhead, that tends to affect shore protection or beach erosion control, without a construction permit from the DNREC. The procedures for obtaining a permit are set forth in section 6 of the regulations and generally require a letter requesting the permit, a project location map, and a detailed plan showing the extent and character of the project.

Section 4.02 provides:

"No person shall commence or conduct construction, reconstruction or alteration of the following without a siting permit therefor from the Department:

   a dwelling, commercial establishment or any other structure not covered in Section 4.01 that is proposed to be con-

structed seaward of the building line [3] on parcels of land that, as of the effective date of these Regulations (July 26, 1973):

1. were entirely seaward of the building line; or
2. contained an area landward of the building line that was not adequate for construction, as determined by the Division.

Issuance of the permit under this Section will be conditional upon the existence or construction of adequate protection against the design storm,[4] as determined by the Division, prior to construction of the structure. Procedures for permit applications under this Section are in Section 7."

The primary purpose of section 4.02 is to insure that all new construction on the beach is capable of withstanding the inevitably damaging storms of the future. The requirement that the construction provide "adequate protection against the design storm" is directed to that end.

The application procedures of section 7 generally require a letter requesting the permit, a list of names and mailing addresses of adjacent property owners, a copy of the deed to the property, and detailed plans of the proposed structure.

To aid the Division in its determination of an application, section 8.03 of the regulations provides:

"a. The Division shall consider:

1. any comments received;
2. the effect of the proposed project on beach erosion, flooding, and potential damage to the subject property and to other properties, taking into account the storm damage data in the Findings; and
3. the feasibility of alternate protection from storm damage that may be available.

b. The Division may:

1. make a site inspection;
2. hold informal conferences;
3. confer with any person; and
4. undertake other investigation or activity as deemed necessary to carry out the purposes of the Act."

The ultimate determination by the Division whether a permit will issue depends on whether it "will best implement the purposes of the Act and these Regulations." *Regulations* § 8.04. Thus, the DNREC's authority to grant or deny "written approval" pursuant to 7 *Del.C.* § 6803(c) has been formalized in its regulations which provide a standard operating procedure and which tend to circumscribe the broad administrative discretion given the DNREC in the Act.

As to the existence of procedural safeguards, the regulations provide for a system of public notice and a corresponding period for public comment.

"Upon receipt of a permit application in proper form, the Division shall advertise

---

3. "*Building Line*—means the approximate landward toe of the primary coastal dune, as determined by the Division. Where the primary coastal dune does not exist or only partially exists, the landward toe will be approximated by extrapolating a line between existing portions of the landward toe of the dune, except where superceded by a public roadway for the use of automobiles. In those areas, the eastern boundary of the roadway shall be the building line."

\*     \*     \*     \*     \*     \*

"*Primary Dune* . . . is generally the first and largest dune encountered moving landward from the shoreline."
*Regulations* § 1.

In the present situation, the record indicates that the landward toe of the primary dune

tends to coincide with the eastern boundary of Ocean Road, which forms the western boundary of the lots on which the condominium was to be located. Thus, the proposed condominium was to be constructed entirely seaward of the building line.

4. "*Design Storm*—means a storm which produces a tide stage of 10.0 feet above sea level datum and has a calculated frequency of occurrence of once in 100 years." *Regulations* § 1.

As reference figures, the storm of March, 1962, which claimed the lives of seven persons and caused nearly $22 million damage in Delaware, produced a tidal stage of between 6 and 7 feet along the Delaware oceanfront; the storm produced the highest recorded elevation of 7.9 feet at Breakwater, Delaware."

in a daily newspaper of state-wide circulation and in a newspaper of general circulation in the County in which the activity is proposed:

(1) that the application has been received;

(2) a brief description of the nature of the application; and

(3) that comments will be received for 15 days by the Division regarding the application.

The Division shall notify all adjacent property owners as listed in permit applications. The application shall be available for public inspection at the Dover office of the Division. All notice shall be made not less than 20 days before a decision is rendered." *Regulations* § 8.02.

Upon rendering a decision on an application, the Division is required to give "written notice with reasons to the applicant, to adjacent property owners and to other persons who have requested that they be notified. . . ." *Regulations* § 8.04.

Affected parties may then appeal from the Division's decision to the Secretary of the DNREC and obtain a public hearing on the matter. *Regulations* § 9. Finally, section 12 of the regulations enables parties aggrieved by the Secretary's order to obtain review by the Superior Court as provided in Super.Ct.Civ.R. 72.

In effect, then, an aggrieved party has an established right of administrative review, which, in turn, is subject to the well established right of judicial review. This two-tiered system of review also tends to protect affected parties from arbitrary administrative decisions.

## IV

In conclusion, we find that the Beach Preservation Act of 1972 necessarily grants the DNREC the implied power to issue permits in order to regulate construction on private beaches. We emphasize that the DNREC is not in the business of issuing building permits generally, nor is it authorized to do so merely because construction is proposed on a Delaware beach. Under the Act, the DNREC's authority and responsibility is limited to the regulation of construction as it may affect the beach. That is the part it has to play (under the circumstances of this case) in the construction of structures on a private beach. Furthermore, because the Act, together with its accompanying regulations promulgated by the DNREC, provide a "totality of protections" against arbitrary administrative discretion, including both substantive standards and procedural safeguards, we hold that the DNREC's permit procedures are the product of a lawful delegation of legislative power.

AFFIRMED.