Everett Clifton CANNON and Allie Marie Cannon, his wife, Defendants Below, Appellants,

v.

STATE of Delaware, Upon the Relation of the Secretary of the Department of Transportation, Plaintiff Below, Appellee.

No. 418, 2001.

Supreme Court of Delaware.

Submitted: May 21, 2002.
Decided: Aug. 28, 2002.
Rehearing Denied Oct. 11, 2002.

WALSH, Justice for the Majority.

In this interlocutory appeal from a Superior Court order of possession, we address the scope of the condemnation powers delegated to the Department of Transportation of the State of Delaware ("DelDOT"). The appellants/defendants below are the owners of 6.5 acres of land in Sussex County that DelDOT seeks to condemn in order to create a wetlands

mitigation site. The wetlands mitigation is required as a condition of the U.S. Army Corps of Engineers' permit to fill other wetlands in connection with the Route 54 highway reconstruction project in Sussex County. After a contested condemnation hearing, the Superior Court granted DelDOT's request for possession. The property owners have appealed, arguing that DelDOT lacks the authority to condemn land for wetlands mitigation, and, even if it has such authority, it acted unreasonably by failing to explore alternative sites. We agree with the trial court that DelDOT's statutory grant of authority to condemn land extends to wetlands mitigation, and that it acted within that authority in this case.

I.

Appellants Everett and Allie Cannon ("the Cannons") own a coastal farm on the Little Assawoman Bay that is adjacent to the current Route 54 in Sussex County, Delaware. Route 54 serves as an essential hurricane evacuation route for the seashore area but is often rendered inaccessible due to flooding. In recognition of this problem, DelDOT commenced a study in 1992 to determine what improvements should be made to the road. Seven design alternatives for the Route 54 project were considered. The study evaluated each alternative design for its social, economic, and environmental impact on the surrounding area, as required by the National Environmental Policy Act. With the exception of the first alternative, to do nothing, all of the designs, to varying extents, would necessarily interfere with the Cannons' property and require the filling of wetlands. Eventually, after public notice and debate, DelDOT chose a design featuring an elevated viaduct and a six foot elevated fill berm to access it. The viaduct will extend across approximately 2,460 feet

of the Cannons' land and cross federally protected wetlands.

The Cannons did not dispute DelDOT's plan to condemn the portion of their land necessary for actual highway improvements. The Cannons did, however, refuse to surrender any of their land to accommodate wetlands mitigation necessitated by the project. The Route 54 project will require the filling of 1.87 acres of wetlands and removal of .955 acres of fill for temporary and shading of wetlands. Acting under the authority delegated to it by the Clean Water Act, the U.S. Army Corps of Engineers ("the Corps") requires a permit to fill wetlands and maintains a "no net loss" policy, which requires wetlands mitigation to accompany any wetland filling operation. 33 *U.S.C.* § 1344; 33 *C.F.R.* § 320.4(r). This means, essentially, that DelDOT must create wetlands to replace those lost by the Route 54 improvements. Thus, DelDOT sought condemnation of 6.5 acres of the Cannons' property in order to create the necessary wetlands.

DelDOT cannot build the Route 54 project without a fill permit from the Corps, and the Corps will not issue a permit without acceptable wetlands mitigation. By virtue of a memorandum of understanding between the Corps and the Environmental Protection Agency, the Corps operates under a protocol of sequential review of possible mitigation sites. Under the protocol, the most desirable site is one that is both on-site and in-kind. If the most preferred mitigation site is not practical or feasible, the Corps will consider alternatives in descending order of preference: off-site and in-kind, on-site and out-of-kind, and off-site and out-of-kind. The Cannons' land is both on-site and in-kind, because it is adjacent to the impact area and amenable to the creation of tidal wetlands. In short, the Cannons' wetlands

essentially replicate the wetlands to be filled in constructing the road.

DelDOT hired an expert wetlands consultant, Edward Launay, to develop a wetlands mitigation plan that would be acceptable to the Corps. Based on Launay's recommendation, DelDOT offered only one mitigation site to the Corps, the Cannons' property. After the Cannons expressed their opposition to having their land used for wetlands mitigation, DelDOT investigated the feasibility of off-site mitigation sites. Launay reviewed all DelDOT-owned land in Sussex County and concluded that none would be acceptable to the Corps as suitable for the creation of tidal wetlands. The Cannons concede that their land is the best ecological site, but argue that other, less desirable sites could be acceptable to the Corps. Despite the Cannons' opposition, the Corps granted DelDOT's fill permit and DelDOT is prepared to go forward with construction of the Route 54 project. According to the Corps' permit, however, construction cannot begin until DelDOT actually acquires the Cannon property. Although wetlands mitigation is needed before construction can begin, once the highway is built it will play no role in the function of the roadway.

## II.

■ Our standard and scope of review of the Superior Court's interpretation of the condemnation statute is *de novo*. *Public Water Supply Co. v. DiPasquale*, 735 A.2d 378, 382–83 (Del.1999).

The Cannons first argue that DelDOT lacks statutory authority to condemn private land for wetlands mitigation purposes. Although 17 *Del. C.* § 132(c) does not contain language authorizing DelDOT to condemn land specifically for "wetlands mitigation," DelDOT asserts that the grant of condemnation power is broad enough to encompass this purpose. The Superior

Court agreed, holding that the taking of the Cannons' land is "necessary for a proper, public purpose," because, as a practical matter, DelDOT cannot make the improvements to Route 54 without providing wetlands mitigation.

■ We agree with the Superior Court that 17 *Del. C.* § 132 grants DelDOT the authority to condemn land for wetlands mitigation, if necessary to advance the underlying purpose of construction and maintenance of the State's roadways. It is beyond dispute that as a sovereign governmental entity, the State of Delaware retains the power of eminent domain and that it may delegate that power to agencies charged with furthering some public good. *Thomison v. Hillcrest Athletic Ass'n.*, 5 A.2d 236, 238 (Del.Super.1939). The statute granting DelDOT the power of eminent domain provides that, in furtherance of the construction of a comprehensive and permanent system of state highways, DelDOT may: "[a]cquire by condemnation or otherwise any land, easement, franchise, material or property, which, in the judgment of the Department, shall be necessary therefor...." 17 *Del. C.* § 132(c)(4). The General Assembly further granted DelDOT the power to do "whatever is incidental and germane to the scope of the duties and powers conferred on it by law." 17 *Del. C.* § 132(d).

■ Statutes that vest the power of eminent domain in an agency must be strictly construed, however, because, by their operative nature, they subjugate the rights of private property owners to the greater public need. *State ex rel. Sharp v. 0.6878 Acres of Land*, 105 A.2d 205, 206 (Del.Super.1954). Despite the strict construction we must accord 17 *Del. C.* § 132, our overriding goal is to determine the intent of the legislature. In this vein, we

note that the Superior Court has construed the statute to allow DelDOT to condemn property for the purpose of building a toll plaza and an administrative building, which the court deemed "necessary for the construction and use" of a state highway. *State v. M. Madic, Inc.*, C.A. Nos. 96C–11–192, 96C–11–193, 96C–11–196, 96C–11–197, slip. op. 17–19, Quillen, J. (Del.Super.Jan. 24, 1997). Ultimately, the court reasoned, the property owners' proffered interpretation of the statute would "hamstring DelDOT's efforts to construct any state roadway, and Title 17 is not so restrictive." *Id.*

Courts in other states have also concluded that environmental mitigation is a practical necessity for public construction projects and have allowed state agencies to condemn private land for wetlands mitigation. *See State v. Trap Rock Industries, Inc.*, 338 N.J.Super. 92, 768 A.2d 227, 231 (2001) (holding that, "[a]lthough mitigation is strictly environmental in its nature, the highway could not have been constructed without [it] ... [t]herefore, the property at issue was realistically needed for transportation purposes"); *Dare County Board of Education v. Sakaria*, 118 N.C.App. 609, 456 S.E.2d 842, 845–46 (1995) (holding that county board of education was statutorily authorized to condemn land for use as wetlands mitigation, as necessary to construction of new athletic facilities).

The same rationale is applicable here. Were the Cannons' very narrow construction of the statute to be accepted, DelDOT would be substantially hampered in its efforts to fulfill its statutory mandate to establish a comprehensive system of state highways. 17 *Del. C.* § 132(a). Whenever a proposed roadway interfered with federally protected wetlands, and the property owner refused to sell, DelDOT would be forced to abandon the project, no matter how "necessary" and compelling would be the public need. We do not believe that the General Assembly, in conferring upon DelDOT a broad grant of condemnation power, intended that such authority be exercised only with the consent of adjacent landowners, where wetlands mitigation is required by federal law.

## III.

Having determined that DelDOT has the statutory authority to condemn land for wetlands mitigation, we address the Cannons' claim that, in this instance, DelDOT abused that authority. First, a discussion of the standard of review applicable to the Superior Court's decision, and DelDOT's decision, is necessary. The General Assembly has granted DelDOT the authority to condemn private land for public use, providing that DelDOT may "[a]cquire by condemnation or otherwise any land, easement, franchise, material or property, which, *in the judgment of the Department*, shall be necessary therefor...." 17 *Del. C.* § 132(c)(4) (emphasis supplied). There is little question that DelDOT's condemnation of the Cannons' property was for a public use, *i.e.*, to enable the State to improve a hurricane evacuation route. The question raised by the Cannons is, was the taking of their wetlands, in particular, necessary? The statute makes clear that DelDOT is empowered to make that determination in the first instance. Once DelDOT determines a particular property is necessary to the fulfillment of its duty to maintain the State's highways, the courts must accord broad deference to that decision.

When the General Assembly delegates the right of eminent domain to a governmental agency for a public purpose, as it has to DelDOT, it may also delegate to such agency the power of determining what property and how much property is necessary for the purpose. *State ex rel.*

*Sharp v. 0.62033 Acres of Land,* 110 A.2d 1 (Del.Super.1954), *aff'd,* 112 A.2d 857 (Del. 1955). The only limit to that power is that it may not be exercised "thoughtlessly or arbitrarily." *0.24148, 0.23831 & 0.12277 Acres of Land v. State ex rel. Smith,* 145 A.2d 388 (Del.1958); *see also Public Water Supply Co. v. DiPasquale,* 735 A.2d 378, 383 n. 9 (Del.1999) (noting that expert agency determinations of fact, applied to settled law, are reviewed for an abuse of discretion). Indeed, the Superior Court Civil Rules recognize that deference is owed to DelDOT's condemnation determinations. Rule 71.1, governing condemnation proceedings, provides that "[i]n all such condemnation proceedings the burden shall be upon the property owner to overcome the *presumption of regularity and the prima facie case of necessity* for public use presented by the institution of such proceeding." Super. Ct. Civ. R. 71.1 (emphasis supplied).

■■■ The power of eminent domain belongs exclusively to the legislative branch. *See Joslin Mfg. Co. v. City of Providence,* 262 U.S. 668, 678–79, 43 S.Ct. 684, 67 L.Ed. 1167 (1923) (stating "[t]hat the necessity and expediency of taking property for public use is a legislative and not a judicial question is not open to discussion"). The General Assembly's exercise of that power through delegation to an administrative agency may be reviewed by the courts only to ensure that the power is not wielded punitively or arbitrarily. Our standard of review "mirrors that of the Superior Court." *Public Water Supply Co. v. DiPasquale,* 735 A.2d 378, 380 (Del. 1999). In this case, the Superior Court accorded DelDOT the proper deference when it reviewed its necessity determination for "fraud, bad faith, or gross abuse of discretion." *State ex rel. Sharp v. 0.62033 Acres of Land,* 110 A.2d 1, 6 (Del.Super.1954), *aff'd,* 112 A.2d 857 (Del.1955).

Accordingly, we review DelDOT's determination that the Cannons' land is necessary for the Route 54 highway project for fraud, bad faith, or abuse of discretion.

■■■ While there is no evidence that DelDOT acted fraudulently or in bad faith, the Cannons contend that DelDOT acted unreasonably and abused its discretion in selecting their property as necessary for wetlands mitigation without first exploring if there were any State-owned lands that would suffice. DelDOT maintains that, because the Cannons' land is both on-site and in-kind, the Corps would not have accepted anything less. Indeed, the Corps would not consider an alternative mitigation site unless the Cannons' land was not "practical or feasible." Given our determination that DelDOT has the authority to acquire the Cannons' land, it would be unlikely that the Corps would deem it impractical. Furthermore, DelDOT did investigate alternative mitigation sites, but found that DelDOT did not own any land in the vicinity that would be suitable to wetlands mitigation. We do not believe that DelDOT was obligated to conduct an inventory of all State-owned lands. It is enough that DelDOT hired an expert to determine the best mitigation site available, researched the feasibility of alternative mitigation sites, and attempted to negotiate with the Cannons before resorting to condemnation.

The fact that DelDOT focused on the Cannons' property as the first choice for wetland's mitigation is understandable because it was "on-site/in-kind" and readily acceptable to the Corps. The dissenters complain that the choice was made before exploration of other alternatives. But when DelDOT's taking was challenged in the Superior Court, the agency was able to demonstrate that no other site in its available inventory achieved the same level of acceptability. Importantly, DelDOT was able to justify the necessity of the taking

when required to do so in the Superior Court and we agree with the Superior Court's ruling that the process followed by DelDOT was "rational and logical." [1]

DelDOT has been charged by the General Assembly with doing whatever is necessary to ensure that the citizens of this state have suitable highways upon which to travel. There is no question that DelDOT had a "proper public purpose" to pursue the Route 54 project. *See Wilmington Parking Authority v. Land with Improvements, Situate in the City of Wilmington,* 521 A.2d 227 (Del.1986). A hurricane evacuation route that routinely floods is clearly a matter of public concern and its improvement is in the best interest of the public. Although there may be more that DelDOT could have done to avoid condemning the Cannons' land for wetlands mitigation, we cannot say that it acted unreasonably in choosing the site that gave it the greatest chance of obtaining the permit from the Corps which was required to begin construction of the project.

Accordingly, we affirm.

VEASEY, Chief Justice, concurring.

I join in the opinion of the majority, but I write separately to emphasize that, in my view, the affirmance of the judgment of the trial court is compelled by the narrow scope of the standard of review. The determination of whether the taking of the Cannons' land for wetlands mitigation was necessary is controlled by the standard of review at two levels: (i) that exercised by the Superior Court when DelDOT's decision to condemn a particular wetland was challenged by the Cannons and (ii) when this Court reviews the Superior Court. In each case, the standard is the same.

We all agree that the ultimate issue in this case is the "necessity" determination of DelDOT to take the Cannons' land for wetlands mitigation. The Superior Court heard live testimony on that point and made findings of fact, based on the evidence presented at trial. Based on those findings the trial court concluded that DelDOT had not abused its discretion in making the determination of necessity for taking the Cannon property.

The issue before the Superior Court was not whether the trial judge should substitute his judgment for that of DelDOT, the agency charged by the General Assembly with the statutory responsibility to make that judgment. Rather, the issue before the trial judge was whether the DelDOT determination was based on supportable facts and reason, whether or not the trial judge would have reached the same judgment in the first instance. Stated differently, the issue before the trial judge was whether DelDOT's exercise of its "judgment," as called for in the statute, was the product of fraud, bad faith or abuse of discretion.[2] The trial judge applied that

---

1. In its bench ruling, the Superior Court noted that "as a practical matter, that if DelDOT had even gone and looked at [the other] properties, they would not have ranked as high as the Cannons' property in terms of being suitable for wetlands mitigation." The court commented that it was satisfied, based on the testimony of DelDOT's environmental consultant, that the agency acted "in a very fair, rational and logical manner, and, second, Mr. Cannon had made it pretty clear that he didn't want any of his lands to be used for wetlands, and based on the testimony that I heard, he never changed his mind, and if he did change his mind, he never communicated that to DelDOT."

2. *State ex rel. Sharp v. 0.62033 Acres of Land,* 112 A.2d 857, 859 (Del.1955) ("In the absence of fraud, bad faith or abuse of discretion, the determination of the Legislature or of the state agency to whom the power has been delegated will not be disturbed.").

analysis to the facts adduced at trial[3] and concluded that DelDOT's judgment was not an abuse of discretion.

The next and final level of review is that to be applied by this Court. Although our scope of review on statutory construction and constitutionality is de novo, our scope of review is deferential on the trial judge's factual findings on DelDOT's "judgment" of the "necessity" of the taking of the Cannons' property. Specifically, the issue is not whether we would agree in the first instance with DelDOT's determination of necessity or even whether, in the second instance, we would have come to the same conclusion as did the trial judge on this record. Rather, our task is as follows:

In exercising our power of review, we have the duty to review the sufficiency of the evidence and to test the propriety of the findings below. We do not, however, ignore the findings made by the trial judge. If they are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, *even though independently we might have reached opposite conclusions.* It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact.[4]

In my view, the findings of the trial court on the exercise of DelDOT's discretion meets this test of our judicial review. The Cannons' land was favorably located as "on-site and in-kind." DelDOT did, ultimately, consider other alternatives, and, upon examining those alternatives, it found that none achieved the same level of acceptability as the Cannon property.

DelDOT's judgment of necessity permits it to consider a rank order of preferences within the universe of acceptable sites. A relevant and permissible factor in that analysis is what DelDOT believes the Corps would likely accept. DelDOT is not relegated to a choice of only minimally acceptable sites in the face of an objection by the landowner of the preferred site. Therefore, whether or not we are comfortable with the result or whether we would have preferred a different outcome, in my view our affirmance of the trial court is compelled by our narrow scope of review.

HOLLAND, Justice, with whom Justice Steele joins, dissenting.

We agree with the holding by the majority that DelDOT has the statutory authority to condemn land for wetlands mitigation if that action is reasonably *necessary* for

---

3. *See, e.g.,* facts set forth in the Majority Opinion at 12, n. 1.

4. *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del. 1972) (emphasis added); *cf. Hudak v. Procek,* 806 A.2d 140 at 144 (Del.Supr.) (stating that, when this Court's "scope of review is narrow and accords considerable deference to the trial judge's factual findings," those findings will not be disturbed, "whether or not we would independently have reached the same conclusions"); *Young v. Frase,* 702 A.2d 1234, 1235 (Del.1997) (stating, in the context of a trial court's decision regarding a motion for additur or a new trial, that this Court will "not substitute [its] judgment for that of the trial judge, who presided at trial and heard the evidence," unless her "determination is beyond the range of reasonableness or constitutes an abuse of discretion"). *Cf. Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 45 (Del.1994) ("If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.").

the purpose of maintaining State highways. The record reflects that DelDOT's condemnation of the Cannons' additional property for wetlands mitigation was unnecessary and unreasonable. Accordingly, we respectfully dissent.

### Eminent Domain

The power of eminent domain is an inherent aspect of sovereign authority. It is the "power to compel a transfer of property from a private owner to the government for a public purpose."[5] The power of eminent domain is the most drastic of all interferences with private property rights. James Madison expected that "[i]ndependent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights."[6]

Our constitutional democracy frequently calls for balancing competing rights of fundamental importance. There is no doubt that the State of Delaware can exercise its sovereign authority to condemn private property for the greater public good. Article I, Section 8 of the Delaware Constitution, however, prohibits the taking of the Cannons' property for public use "without the consent of his or her representatives."

### Unbridled Administrative Discretion

The power of eminent domain belongs exclusively to the legislative branch of the government.[7] The General Assembly may delegate the right of eminent domain to an administrative agency for a public purpose. The General Assembly's ability to delegate an exclusively legislative function, however, is carefully circumscribed by the parameters of the non-delegation doctrine.

This Court has recognized that the non-delegation doctrine is based upon a fundamental principle of constitutional democracy: "[a]dministrators should not have unguided and uncontrolled discretionary power to govern as they see fit."[8] Accordingly, reviewing Courts must focus on the "totality of protections against [administrative] arbitrariness," including "both substantive standards and procedural safeguards," i.e., due process or the law of the land, as the latter term appears in the Delaware Constitution.[9] Where it is not feasible for the General Assembly to set precise guidelines, the presence of administrative procedural safeguards may compensate for the lack of precise statutory standards.[10]

In most situations involving action delegated to an administrative agency, an aggrieved party has a right of administrative review that is subject to the right of judicial review.[11] That two-tiered system of review is designed to protect adversely affected parties from arbitrary administrative decisions.[12] In this case, the General Assembly did not provide any statutory standards for DelDOT to use in making its administrative determination of necessity. DelDOT did not apparently adopt any substantive or procedural safeguards for either making a determination of necessity

5. James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights* 5 (2d ed.1998).

6. 12 *The Papers of James Madison* 204–07 (Charles F. Hobson & Robert A. Rutland eds., 1979).

7. See *Joslin Mfg. Co. v. City of Providence*, 262 U.S. 668, 678–79, 43 S.Ct. 684, 67 L.Ed. 1167 (1923).

8. *Atlantis I Condo. Ass'n v. Bryson*, 403 A.2d 711, 713 (Del.1979).

9. *Id.* at 713, 717.

10. *Id.* at 713.

11. *Id.* at 717.

12. *Id.*

or for providing administrative review of that decision.

Accordingly, judicial review is the *only* protection the Cannons have against an exercise of unbridled administrative discretion by DelDOT. The applicable statute provides for DelDOT to exercise its judgment in making the determination of necessity for condemning private property. There is no precedent, however, for judicial deference to an administrative agency's determination that it is necessary to condemn private property for a public purpose when that determination is made without any substantive or procedural safeguards.

Statutes that vest the power of eminent domain in an administrative agency must be strictly construed because by their operative nature they subrogate rights of private property owners to the greater public need.[13] The record reflects that the Cannons have demonstrated conclusively that, although DelDOT was required to provide property for wetlands mitigation, it was not necessary to take the Cannons' additional private property to accomplish that purpose. The Cannons' constitutionally protected private property rights cannot be subordinated to an administrative agency's decision to repudiate the pursuit of a myriad of acceptable alternatives for wetlands mitigation, simply as a matter of its own convenience.

### Issue Presented

This case relates to two separate takings of the Cannons' private property by Del-DOT. The primary taking is of wetlands property owned by the Cannons that the State wants to use for the purpose of improving Route 54. The Cannons acknowledge that the State has the right to exercise its sovereign power of eminent domain to condemn their private wetlands property for the purpose of actually improving Route 54, notwithstanding the Cannons' objections to that taking. Accordingly, the record does not support the majority's assertion that "[w]ere the Cannons' very narrow construction of the statute to be accepted, ... [w]henever a proposed roadway interfered with federally protected wetlands, and the property owner refused to sell, DelDOT would be forced to abandon the project, no matter how 'necessary' and compelling would be the public need." The primary taking of the Cannons' private wetlands property for the purpose of *actually* improving Route 54 is simply not an issue in this case.

The issue in this case is the "additional taking" of the Cannons' private property that the State seeks to condemn for the purpose of mitigating the wetlands that will be lost when Route 54 is improved. The Cannons contend that the additional taking of their private property is not necessary. DelDOT submits that the taking of the Cannons' additional property for wetlands mitigation is necessary to improve Route 54 because the State cannot make improvements to Route 54 without a permit from the Corps and the Corps will not issue a permit to the State unless the State provides additional land for wetlands mitigation.

The logical question is, can DelDOT accommodate the Corps' wetlands mitigation requirement without taking additional private property from the Cannons? The record reflects the answer to that question is an unqualified "yes." The Corps has a hierarchy of preferences for property that will *each* satisfy its general requirement for wetlands mitigation. The Corps' hierarchy of preferences is a specific recognition that one or more of the Corps' highest

---

**13.** *See State ex rel. Sharp v. 0.6878 Acres of*    *Land, 105 A.2d 205, 206 (Del.Super.Ct.1954).*

preferences of property for wetlands mitigation may not be available.

Why then did DelDOT offer the Cannons' additional private property to the Corps for wetlands mitigation? The answer is because DelDOT knew that the Cannons' additional property comported with the Corps' highest preference for on-site and in-kind wetlands mitigation. DelDOT offered the Cannons' additional private property to guarantee the Corps' permit approval by avoiding negotiations with the Corps about other property that the State either owned or could buy, because any of those other properties would be further down the Corps' hierarchy of preferences for wetlands mitigation. Accordingly, the question presented to this Court is, whether an administrative agency can condemn the Cannons' additional private property simply because it did not want to negotiate with the Corps about providing for wetlands mitigation with other property that the State owned or could buy?

### Property and Liberty

The most definitive and authoritative book on property rights and liberty in America was written by Professor James W. Ely, Jr.[14] The title for Professor Ely's work was inspired by Virginian Arthur Lee's declaration that "[t]he right of property is the guardian of every other right, and to deprive a people of this, is in fact to deprive them of their liberty."[15] A brief historical review is helpful to understand

why DelDOT had no authority to condemn the Cannons' private property.

The origin of property rights in America can be traced to the Magna Charta in 1215, which protected the rights of property owners against arbitrary action by the sovereign. It provided in chapter 39 that "[n]o freeman shall be taken or imprisoned, or disseised ... unless by the lawful judgment of his peers, or by the law of the land." With this language, the Magna Charta secured the rights of private property owners against deprivations by the sovereign without due process of law.[16] That guarantee remains one of the most fundamental tenets of our American constitutional democracy.

In 1687, when the State of Delaware constituted the three lower counties of Pennsylvania, William Penn ("Penn") arranged for the publication of a commentary on the Magna Charta.[17] Penn implored American colonists "not to give away any thing of *Liberty* and *Property* that at present they do ... enjoy."[18] In 1689, John Locke ("Locke") wrote his famous *Second Treatise on Government,* which asserted that legitimate government was based on a compact between the people and their rulers.[19] "According to Locke, private property existed under natural law before the creation of political authority. Indeed, the principal purpose of government was to protect these natural property rights, which Locke fused with liberty."[20] Undoubtedly influenced by Locke, the rights of property owners were charac-

---

14. James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights* (2d ed.1998).

15. *See id.* at 26 (quoting Arthur Lee, *An Appeal to the Justice and Interests of the People of Great Britain, in the Present Dispute with America* 14 (New York, 1775)).

16. *Id.* at 13.

17. *Id.*

18. William Penn, *The Excellent Privilege of Liberty and Property Being the Birth–Right of the Free–Born Subjects of England* (Philadelphia, William Bradford 1687).

19. Ely, *supra,* at 17.

20. Ely, *supra,* at 17.

terized by the most prominent political theorists in the eighteenth century as the "bulwark of freedom from arbitrary government." [21]

In 1721, John Trenchard stated, "All Men are animated by the Passion of acquiring and defending Property, because Property is the best Support of that Independency, so passionately desired by all Men." [22] The Lockean theory of property rights was reflected in the English common law. In his *Commentaries on the Laws of England* (1765–1769), William Blackstone acknowledged the influence of Locke's formulation on the law's evolution. Blackstone summarized the English common law on property rights in broad terms: "So great moreover is the regard of the law for private property, that it will not authorize the least violation of it." [23] Prior to the American Revolution, property ownership became identified with the preservation of political liberty. Blackstone's *Commentaries* were studied as a definitive summary of English common law. [24] The Declaration of Independence reflected the inseparability of political liberty and private property described in the compact theory of Locke. [25]

## 1776 Delaware Constitution

Following the Declaration of Independence from the English monarchy, the historic authority of general sovereignty became vested in each of the former colonial states. [26] As new sovereign entities, each state drafted its own constitution. [27] The first colonial constitutions attempted to set forth in writing universal principles, grounded in reason. [28]

The challenge in writing state constitutions was to reconcile the known conceptions of sovereignty with "notions about the popular foundations of legitimate government." [29] Those efforts were influenced by philosophers, such as Charles Montesquieu, Jean Jacques Rousseau, and Locke, and by English common-law scholars, like Edward Coke, Henry deBracton and William Blackstone. [30] Each state constitution attempted to define sovereignty with precision and to restrain its exercise within marked boundaries. [31]

The first Delaware Constitution and the Declaration of Rights and Fundamental Rules of the Delaware State ("Declaration of Rights") were adopted in September 1776. The primary authorship of the 1776 Delaware Constitution and Declaration of

21. Ely, *supra*, at 17.

22. John Trenchard, Cato's Letters, no. 68, Mar. 3, 1721, *in The English Libertarian Heritage* 177–78 (David L. Jacobson, ed.1965).

23. 1 William Blackstone, *Commentaries* *135.

24. Ely, *supra*, at 17.

25. Ely, *supra*, at 29.

26. *See generally* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 Temp. L.Rev. 989, 989–90 (1996).

27. *See* Willi P. Adams, *The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era* 4 (1980); Gordon S. Wood,

*Foreword: State Constitution–Making in the American Revolution*, 24 Rutgers L.J. 911, 913–14 (1993); Note, *The Theory of State Constitutions*, 196 Utah L.Rev. 542 (1966).

28. Adams, *supra*, at 4.

29. Jefferson Powell, *Languages of Power, A Source Book of Early American Constitutional History* 22 (1991).

30. Daniel A. Farber & Suzanna Sherry, *A History of the American Constitution* 6 (1990).

31. *Seminole Tribe v. Florida*, 517 U.S. 44, 168, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Souter, J., dissenting) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 398–99, 1 L.Ed. 648 (1798) (Iredell, J., dissenting in part)).

Rights is traditionally ascribed to Thomas McKean, a Delaware lawyer and signatory of the Declaration of Independence.[32] McKean had studied the English common law at the Middle Temple in London, where he was a contemporary of William Blackstone.[33]

The first section of the Declaration of Rights reflected a continued adherence to the philosophy of Locke and provided that "all government of right originates from the people, is founded in compact only, and instituted solely for the good of the whole." [34] The first Delaware Constitution also reflected a continued adherence to the English common law and stated:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution .... [35]

The 1776 Delaware Constitution was preceded by the Declaration of Rights.[36] The principles from the Magna Charta that protected property rights were includ-

ed in the 1776 Declaration of Rights. Section 10 provided that "every member of society hath a right to be protected in the enjoyment of life, liberty and property [and] ... no part of a man's property can be justly taken from him or applied to public uses without his own consent or that of his legal Representatives." [37] Section 12 provided that "every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by course of the law of the land." [38]

### United States Constitution

Protecting the right to acquire and own private property was also of a paramount importance to the Framers of the United States Constitution. Invoking the philosophy of Locke, John Rutledge of South Carolina told the delegates at the Philadelphia Convention that "[p]roperty was certainly the principal object of Society." [39] Alexander Hamilton stated, "One great objt. of Govt. is personal protection and the security of Property." [40] According to Professor Ely, "many provisions of the Constitution pertain to property interests and were designed to rectify the abuses

**32.** *Proceedings of the Assembly of the Lower Counties on Delaware 1770–1776, of the Constitutional Convention of 1776, and of the House of Assembly of the Delaware State 1776–1781*, at 25 (Claudia L. Bushman et al. eds., 1986).

**33.** See Randy J. Holland, *Introduction to The Delaware Bar in the Twentieth Century* xix, xxv (Helen L. Winslow et al. eds., 1994).

**34.** Declaration of Rights and Fundamental Rules of the Delaware State of 1776, § 1.

**35.** Del. Const. of 1776, art. XXV; *see also* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or. L.Rev. 1279, 1308 (1995).

**36.** The Declaration of Rights was adopted by the convention on September 11, 1776.

Shortly thereafter, the first constitution of the State of Delaware was enacted on September 20, 1776. *See generally* Wood, *supra*, at 921 (noting that the Delaware Constitution, as with constitutions from four other states, was prefaced with a bill of rights, "combining in a jarring but exciting manner ringing declarations of universal principles with motley collections of common law procedures").

**37.** Declaration of Rights and Fundamental Rules of the Delaware State of 1776, § 10.

**38.** *See id.* § 12.

**39.** 1 *The Records of the Federal Convention of 1787*, at 534 (Max Farrand ed., 1937).

**40.** *Id.* at 302.

that characterized the revolutionary era."[41]

In 1790, John Adams stated, "Property must be secured or liberty cannot exist."[42] The Fifth Amendment became effective in 1791 and explicitly incorporated into the United States Constitution Locke's theory that "protection of property is a chief aim of government."[43] The importance of the Fifth Amendment is described by Professor Ely:

> As finally adopted, the Fifth Amendment contains two important property guarantees, along with procedural safeguards governing criminal trials. The amendment provides in part that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Madison's decision to place this language next to criminal justice protections, such as the prohibitions against double jeopardy and self-incrimination, underscored the close association of property rights with personal liberty. Individuals needed security against both arbitrary punishment and deprivation of property.[44]

According to Professor Ely, the Due Process Clause in the Fifth Amendment was a direct descendant of the Magna Charta and the initial state constitutions (like Delaware's) and "in time became the most significant constitutional guarantee of property rights."[45]

## Present Delaware Constitution

Following the enactment of the United States Constitution and the operative effectiveness of the Bill of Rights in 1791, Delaware adopted its own new constitution in 1792. The President of the 1792 Delaware Constitutional Convention was John Dickinson, who had studied the common law of England at the Middle Temple in London with Thomas McKean and, thus, was also a contemporary of William Blackstone.[46] John Dickinson and the other framers of the 1792 Delaware Constitution clearly intended to preserve and incorporate the well-established common-law principles from the 1776 Delaware Constitution into the protections afforded by the Bill of Rights in the 1792 Delaware Constitution.

Today, the first document that appears in the Delaware Code is the Magna Charta.[47] The entire Delaware Bill of Rights has remained virtually intact since those provisions were adopted in the 1792 Delaware Constitution. Article I, Section 8 of the present Delaware Constitution provides: "nor shall any person's property be taken or applied to public use without the consent of his or her representatives, and without compensation being made."

Although this history demonstrates that property rights are fundamental to liberty, they are not paramount. In 1798, United States Supreme Court Justice James Iredell noted that public projects "are *necessarily* sometimes built upon the soil owned by individuals."[48] Accordingly, Justice

41. James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights* 43 (2d ed.1998).

42. *Discourses on Davila, in 6 The Works of John Adams* 280 (Charles Francis Adams ed., Boston, Little Brown 1851).

43. Ely, *supra,* at 54.

44. Ely, *supra,* at 54.

45. Ely, *supra,* at 54.

46. Randy J. Holland, *Introduction* to *The Delaware Bar in the Twentieth Century* xix, xxv, xxxiii (Helen L. Winslow et al. eds., 1994).

47. Del.Code Ann. vol. 1 (1975).

48. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 400 (1798) (Iredell, J., dissenting in part).

Iredell acknowledged that "private rights must yield to public exigencies." [49]

### Necessity Preserves Balance

The members of the General Assembly are the representatives elected to protect the Article I, Section 8 private property rights of Delaware's citizens, such as the Cannons. The General Assembly has properly placed the burden on the State to demonstrate *"necessity"* as a condition precedent to taking private property for a public purpose.[50] Title 17, section 132(c)(4) of the Delaware Code permits DelDOT to discharge its duties under section 132(b) by enabling DelDOT to "[a]cquire by condemnation or otherwise any land, easement, franchise, material or property, which, in the judgment of the Department shall be *necessary*."

It is uncontested that DelDOT could not build the Route 54 project without providing a proposal for wetlands mitigation that was approved by the Corps. In order to condemn the Cannons' additional property for compensatory mitigation, however, DelDOT had to establish that specific condemnation of that particular parcel was *necessary* to commence the Route 54 project. In this case, the record reflects that DelDOT has failed to demonstrate that it was *necessary* to take the Cannons' additional property for the public purpose of improving Route 54. That purpose could have been accomplished by satisfying the Corps' requirement for wetlands mitiga-

tion with other land already owned by the State or other land purchased by the State from a willing seller. The basis for these conclusions is found in the analysis of the law and the facts that follows.

### Federal Statutory and Regulatory Scheme

Section 404(a) of the Clean Water Act generally bans the "discharge of dredged or fill material into the navigable waters" of the United States without a prior permit from the United States Army Corps of Engineers (the "Corps").[51] Section 404 vests the Corps with the statutory authority to regulate wetlands development.[52] Section 404(b)(1) provides that the decision to issue a permit for the discharge of fill material into wetlands is made using guidelines developed by the Corps and the Environmental Protection Agency (the "EPA").[53]

Pursuant to section 404(b)(1), the EPA develops section 404(b)(1) Guidelines, in conjunction with the Corps, for use by the Corps as the permitting authority.[54] In evaluating all applications for Department of the Army permits, the Corps will deny a permit involving activities with section 404 discharges into navigable waters unless the discharge complies with the EPA's 404(b)(1) Guidelines.[55] In addition to ensuring compliance with the section 404(b)(1) Guidelines, the Corps considers wetlands mitigation throughout the permit

**49.** *Id.*

**50.** *See* Del.Code Ann. tit. 17, § 132(c)(4) (1995); *see also Wilmington Parking Auth. v. Land with Improvements,* 521 A.2d 227, 232–33 (Del.1986).

**51.** *See* 33 U.S.C. § 1344(a) (2001); Randall S. Guttery et al., *Federal Wetlands Regulation: Restrictions on the Nationwide Permit Program and the Implications for Residential Property Owners,* 37 Am. Bus. L.J. 299, 301–02 (2000).

**52.** *See* 33 U.S.C. § 1344.

**53.** *See* 33 U.S.C. § 1344(b)(1); Guttery et al., *supra,* at 302.

**54.** Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336 (Dec. 24, 1980) (codified at 40 C.F.R. pt. 230).

**55.** 33 C.F.R. § 320.4(a)(1) (2001).

application review process.[56]  A general statement of the Corps' wetlands mitigation policy for evaluating permit applications is set forth in 33 C.F.R. § 320.4(r).[57] This general statement is not, however, "a substitute for the mitigation requirements necessary to ensure that a permit action under section 404 of the Clean Water Act complies with the section 404(b)(1) Guidelines." [58]

Provisions addressing compliance with the EPA's 404(b)(1) Guidelines are set forth in 40 C.F.R. pt. 230 at subpart B. In reviewing an application's compliance with the section 404(b)(1) Guidelines and determining whether to grant or deny a permit for the discharge of fill material into wetlands, the Corps must further follow the general policies of 33 C.F.R. pt. 320 and procedures of 33 C.F.R. pt. 325.[59]  33 C.F.R. § 320.4(g) states that "[a]uthorization of work or structures by [the Department of the Army] does not convey a property right, nor authorize any injury to property or invasion of other rights."  Under 33 C.F.R. § 320.4(g)(6), an "applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application." [60]  Similarly, 33 C.F.R.

§ 325.1(d)(7) states that an applicant's signature will be an affirmation that the applicant will possess the requisite property interest.  Accordingly, the federal statutory and regulatory scheme clearly contemplates that an applicant will offer land that it owns for purposes of wetlands mitigation.

In this case, the applicant, DelDOT, did not offer any land owned by the State of Delaware to the Corps for wetlands mitigation.  Instead, DelDOT's application to the Corps for a wetlands permit only offered the Cannons' additional land on the assumption that DelDOT had the absolute authority to condemn any property that it wanted to seize for wetlands mitigation. Whether the Cannons' additional property could be condemned for compensatory wetlands mitigation is the crux of this matter.

### Memorandum of Agreement

In furtherance of the federal statutory and regulatory guidelines, the EPA and the Department of the Army entered into a Memorandum of Agreement (the "MOA") for determining mitigation under the Clean Water Act section 404(b)(1) Guidelines.[61]  This MOA articulates "the policy and procedures to be used in the

56.  *See id.* § 320.4(r)(1).

57.  *See id.* § 320.4(r) n.1.

58.  *See id.*

59.  33 C.F.R. § 323.1 (2001).  Adherence to such general policies and procedures is required in addition to those special policies, practices and procedures to be followed by the Corps in connection with permits to authorize section 404 discharges. *See id.*

60.  Richard Hassel ("Hassel"), Assistant Chief of the Corps' Regulatory Branch, testified that the Corps Regulatory Program does not require land ownership in its permit decision. Hassel stated that if the proposed activity was not contrary to the public interest and com-

plied with the necessary federal regulations, the permit would be issued conditioned upon receiving the necessary legal instruments to perform the work on the property.

61.  Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, 55 Fed.Reg. 9,210, at I (Mar. 12, 1990) [hereinafter 1990 Memorandum of Agreement].  The MOA does not change substantive regulatory requirements, maintaining the need for compliance with the EPA's 404(b)(1) Guidelines.  1990 Memorandum of Agreement, at I.

determination of the type and level of mitigation necessary to demonstrate compliance with the Clean Water Act ... Section 404(b)(1) Guidelines." [62] The MOA "must be adhered to when considering mitigation requirements for standard permit applications." [63]

The MOA is the operative document in this appeal. Pursuant to the MOA, the Corps must subject individual permit applications to "a process known as mitigation sequencing" to determine whether the section 404(b)(1) Guidelines have been met. [64] Under the mitigation sequencing program, the Corps initially assesses an application to determine whether the proposed activity "avoids adverse impacts on wetlands to the maximum extent [practicable]." [65] Next, the Corps considers appropriate and practicable [66] requirements that could be placed on the proposed activity to minimize any remaining unavoidable impacts. [67] Finally, the Corps must lessen the effect of unavoidable impacts by requiring the permit applicant to provide appropriate and practicable compensatory mitigation when minimization is not possible. [68]

"The objective of mitigation for unavoidable impacts is to offset environmental losses." [69] Such mitigation should provide, at a minimum, one for one functional replacement, recognizing that the minimum requirement may not be appropriate and practicable in all cases. [70] The MOA does not itself, however, establish "a no net loss policy for the Nation's wetlands." [71]

### Mitigation Sequencing

The MOA mitigation sequencing program was triggered in this case because the Corps determined that the impact to wetlands caused by the DelDOT Route 54 project required compensatory mitigation. The relevant provision of the MOA addressing DelDOT's obligation for compensatory mitigation states:

> Appropriate and practicable compensatory mitigation is required for unavoidable adverse impacts which remain after

62. 1990 Memorandum of Agreement, *supra*, at I.

63. 1990 Memorandum of Agreement, *supra*, at I. The MOA focuses on standard permits which are "those individual permits which have been processed through application of the Corps public interest review procedures (33 C.F.R. 325) and EPA's Section 404(b)(1) Guidelines." 1990 Memorandum of Agreement, *supra*, at I. An individual permit, such as DelDOT's permit, means a "Department of the Army authorization that is issued following a case-by-case evaluation of a specific project involving the proposed discharge(s) in accordance with the procedures of this part and 33 C.F.R. part 325 and a determination that the proposed discharge is in the public interest pursuant to 33 CFR part 320." 33 C.F.R. § 323.2(g) (2001).

64. Guttery et al., *supra*, at 314; *see also* 1990 Memorandum of Agreement, *supra*, at II.C.; Appellants' App. at 248.

65. Guttery et al., *supra*, at 314; 1990 Memorandum of Agreement, *supra*, at II.C.

66. The MOA specifically states that "[i]n determining 'appropriate and practicable' measures to offset unavoidable impacts, such measures should be appropriate to the scope and degree of those impacts and practicable in terms of cost, existing technology, and logistics in light of overall project purposes." 1990 Memorandum of Agreement, *supra*, at II.C.

67. Guttery et al., *supra*, at 314–15; 1990 Memorandum of Agreement, *supra*, at II.C.

68. Guttery et al., *supra*, at 314–15; 1990 Memorandum of Agreement, *supra*, at II.C.

69. 1990 Memorandum of Agreement, *supra*, at III.B.

70. 1990 Memorandum of Agreement, *supra*, at III.B.

71. 1990 Memorandum of Agreement, *supra*.

all appropriate and practicable minimization has been required. Compensatory actions (e.g., restoration of existing degraded wetlands or creation of man-made wetlands) should be undertaken, *when practicable*, in areas adjacent or contiguous to the discharge site (on-site compensatory mitigation). If on-site compensatory mitigation is *not practicable*, off-site compensatory mitigation should be undertaken in the same geographic area if practicable (i.e., in close physical proximity and, to the extent possible, the same watershed). In determining compensatory mitigation, the functional values lost by the resource to be impacted must be considered. Generally, in-kind compensatory mitigation is preferable to out-of-kind.[72]

Under this provision, a hierarchy of preferences is established regarding the type of compensatory action that should be undertaken. The MOA sets forth a preference for on-site compensatory mitigation over off-site, and in-kind compensatory mitigation over out-of-kind.

The MOA provides, as appears from the testimony, the following hierarchical preferences for compensatory mitigation: on-site, in-kind; on-site, out-of-kind; off-site, in-kind; off-site, out-of-kind. In assessing the type of compensatory actions the permit applicant will be required to undertake, the MOA conditions the compensatory action on whether it is "practicable."[73] The MOA specifically states that in determining "practicable" mitigation "[p]racticable is defined at Section 230.3(q) of the Guidelines."[74] "Section 230.3(q) of the Guidelines reads as follows: 'The term practicable means available and capable of being done after taking into consideration *cost, existing technology, and logistics in light of overall project purposes.*'"[75]

The proper focus on the "practicability" of accommodating the Corps' *preference* for compensatory action by DelDOT with on-site, in-kind compensatory mitigation must logically begin on land already owned by the State or available from a willing seller. If undertaking on-site compensatory mitigation was not practicable from land owned by the State or that could be voluntarily acquired, the MOA permitted DelDOT to offer off-site compensatory mitigation. Therefore, it was not necessary to condemn the Cannons' additional land to accomplish the improvements to Route 54.

### DelDOT's Mitigation Proposal

DelDOT's Route 54 project design, constructing an elevated viaduct and a six foot elevated fill berm to access it, crossed wetlands. The fill for the approaches to the viaduct required DelDOT to obtain permits to fill wetlands from the Corps. DelDOT engaged Edward Launay ("Launay"), a professional wetland scientist, to address the issue of wetlands mitigation.

After conducting an assessment of potential wetlands mitigation sites along the Route 54 corridor, Launay selected only one mitigation site, an additional 6.53 acres of the Cannons' land. Initially, Launay

---

72. Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, 55 Fed.Reg. 9,210, at II.C.3 (Mar. 12, 1990) (emphasis added) [hereinafter 1990 Memorandum of Agreement].

73. 1990 Memorandum of Agreement, *supra*, at II.C.3.

74. 1990 Memorandum of Agreement, *supra*, at II.B.

75. 1990 Memorandum of Agreement, *supra*, at II.B.n.3 (alteration in original) (quoting 40 C.F.R. § 230.3(q)).

did not conduct a formal off-site search "since the environmental agencies prefer on-site mitigation as a first option and the Cannon property provided an ideal site adjacent to the roadway improvements." After a June 3, 1999 meeting with the Cannons, however, DelDOT agreed to have Launay review other potential off-site areas near the project.

Nevertheless, the record reflects that Launay submitted the Cannons' property to the Corps as the only mitigation site, apparently without reviewing other off-site areas. Consequently, the Cannons requested, pursuant to the Freedom of Information Act, that DelDOT identify and provide all "lands held by the State which are earmarked or could be used for mitigation of filling Federal Title 10 Section 404 wetlands." In response to the Cannons' Freedom of Information Act request, DelDOT sought to obtain answers through internal communications.

Those internal communications reflect that, in response to the Cannons' request, DelDOT Real Estate employee, V. Wayne Rizzo ("Rizzo"), was asked to provide a list of all State owned lands in the Route 54 project vicinity, which would also be passed on to Launay to review for mitigation potential. On June 15, 2000, Rizzo determined that no DelDOT owned lands existed in the Route 54 project vicinity. On June 19, 2000, DelDOT asked for the evaluation of other state owned land in the area.

Thereafter, as a result of these internal communications, in response to the Cannons' Freedom of Information Act request,

Launay was asked to review eighteen excess Sussex County properties owned by DelDOT for potential use as wetlands mitigation sites.[76] Launay issued a report evaluating DelDOT's properties on September 28, 2000.[77] Launay stated that he thought he was requested to study other DelDOT properties since DelDOT "wanted to make sure that they didn't, in fact, hold other properties that could be suitable and to prepare a document stating so." Launay determined that the eighteen DelDOT properties were inferior to the Cannons' additional property and unacceptable as mitigation sites.

### Cannons Oppose Application

After DelDOT submitted its application for a wetlands fill permit to the Corps, a public notice was issued on December 12, 2000. In response to that notification, the Cannons formally protested the use of their property as a wetlands mitigation site by letter to the Corps dated January 3, 2001. The Cannons also requested that the Corps look to other lands owned by the State of Delaware for mitigation purposes.

DelDOT responded to the Cannons' letter by submitting to the Corps Launay's report, which rejected other DelDOT mitigation sites as inferior to the Cannons' property. Not surprisingly, the Corps disregarded the Cannons' protest. The Corps issued a permit to DelDOT to fill wetlands for the proposed improvements to Route 54 upon the condition that DelDOT secure ownership of the Cannons' additional property prior to commencing work.

---

**76.** Although Rizzo's June 15, 2000 response indicated that DelDOT did not own any lands in the vicinity, Launay's report clearly states that DelDOT provided and requested him to evaluate a list of Sussex County properties owned by DelDOT. No further reference is made within the DelDOT internal communications as to where such a list was generated.

**77.** Appellants' App. at 190–217 (*Evaluation of Wetland Mitigation Potential for Sussex County Properties Owned by the Delaware Department of Transportation* ).

## DelDOT Creates Necessity

DelDOT argues that condemnation of the Cannons' additional property was necessary since the Corps, under the MOA's sequential review, would require wetlands mitigation for the Route 54 project on-site and in-kind, regardless of whether other State owned off-site locations were available for mitigation purposes. This argument is contrary to the MOA's express language. What DelDOT purports to be the Corps' "requirement" for on-site and in-kind compensatory mitigation is in actuality a *non-mandatory preference*. Moreover, the Corps preference for on-site and in-kind compensatory action yields in a hierarchical order whenever that preferred action is not *practicable*. The Corps then allows an applicant to offer compensatory action off-site in the same geographic area, if practicable.

To be "practicable," either on-site or off-site actions should be reasonable in terms of cost, existing technology, and logistics in light of overall project purposes, i.e., from land that the applicant already owns or could acquire from a willing seller. By selecting and submitting only the most preferred, on-site and in-kind solution, DelDOT assumed that compensatory mitigation through a voluntary sale or condemnation of the Cannons' additional property was a practicable alternative. DelDOT knew, however, that the Cannons did not intend to voluntarily transfer their additional property by at least June 3, 1999.

Notwithstanding its knowledge of the Cannons' refusal to sell additional land,

DelDOT applied for a permit from the Corps by offering the Cannons' property as the only mitigation site for compensatory mitigation. The Corps approved DelDOT's permit by requiring the acquisition of the Cannons' additional property prior to commencement of the project. Thus, DelDOT argues it became "necessary" for DelDOT to condemn the Cannons' property in order to fulfill Special Condition 28 of the DelDOT permit to fill wetlands to improve Route 54. The federal regulations specifically provide, however, that a permit from the Corps "does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations." [78]

By submitting only the Cannons' additional property for wetlands mitigation, DelDOT guaranteed that the Corps would condition its grant of a permit to fill wetlands on DelDOT's acquisition of the Cannons' property. In this appeal, DelDOT has the temerity to argue that it is now "necessary" to condemn the Cannons' additional land for wetlands mitigation so that Route 54 can be improved. In fact, DelDOT suggests that it had the right to submit any private property anywhere in the State for wetlands mitigation and then to condemn that property if its acquisition was a condition for obtaining a permit for construction from the Corps.

DelDOT operated under the assumption that the State had the absolute right to condemn the Cannons' additional property. [79] Thus, DelDOT did not offer the Corps any other State owned property for

---

**78.** 33 C.F.R. § 320.4(g)(6)(2001).

**79.** On February 9, 2001, DelDOT stated in a letter to the Corps that for DelDOT "to obtain possession on the property acquisitions that [it] could not negotiate to a settlement, [the Cannons' additional property,] it [would] be necessary for [DelDOT] to demonstrate to the court that [the] project [would] in fact be permitted by the Corps." Accordingly, DelDOT requested the Corps to issue the previously accepted permit, "with appropriate conditions," by mid-March. That date was requested because DelDOT believed "that [it] would allow [DelDOT] sufficient time to complete the property acquisitions."

wetlands mitigation. If any necessity existed for acquiring the Cannons' additional property for mitigation purposes, DelDOT created that necessity by limiting its review to one potential mitigation site that it did not own and that the Cannons did not want to sell.

### Cannons Condemnation Unnecessary

Launay testified that the Cannons' additional property was the only mitigation site submitted to the Corps. Launay testified that in negotiations with the Corps on DelDOT's behalf, he operated under the assumption that "ultimately the State somehow would acquire that piece of property." Launay testified that DelDOT offered the Corps the most preferred mitigation site in order to ease and facilitate the negotiation process for a permit to fill wetlands. Therese Fulmer, DelDOT's Manager of Environmental Studies, Planning, and Project Development, also testified that DelDOT operated under the assumption that they had the power of condemnation and attempted to accommodate the Corps' preference for on-site compensatory mitigation without even considering off-site compensatory mitigation options.

Launay testified that at least 100 acres of State owned land existed that could have been reviewed and offered to the Corps, located in the same watershed, within some level of the Corps' mitigation preferences. The Corps' representative testified that if it was convinced that the Cannons' property was not practicable or feasible the Corps would have considered other mitigation sites.[80] Accordingly, DelDOT's conscious choice to submit only one mitigation site, which it did not even own, to accommodate a non-mandatory prefer-

ence by the Corps resulted in the Corps' imposition of a condition that does not constitute the statutory necessity which would enable DelDOT to condemn the Cannons' additional property.

### Conclusion

The record reflects that condemnation of the Cannons' additional property for wetlands mitigation was neither necessary nor reasonable. Although it was necessary for DelDOT to provide for wetlands mitigation to receive a permit for construction of the improvements to Route 54 from the Corps, it was not necessary to offer the Cannons' additional property to accomplish that purpose. In the absence of establishing a necessity, DelDOT had no statutory authority to condemn the Cannons' additional land.

DelDOT's actions also violated the private property rights that are guaranteed to the Cannons by Article I, Section 8 of the Delaware Constitution. That provision in the Delaware Constitution protects against a taking of the Cannons' private property for public purposes without the consent of the Cannons' elected representatives. The General Assembly conditioned DelDOT's authority to exercise the inherent sovereign powers of eminent domain upon a demonstration of necessity. Since DelDOT's condemnation of the Cannons' additional land was unnecessary, it was not in accordance with the applicable statute enacted by the Cannons' elected representatives. In the absence of procedural safeguards, DelDOT's action also violated the non-delegation doctrine that is based upon the due process rights of private property owners that are guaranteed

**80.** Hassel testified that if the State could not condemn the Cannons' additional property the Cannons' mitigation site would not be feasible for compensatory mitigation. Hassel stated the Corps would then sequentially review other potential mitigation sites under the MOA's hierarchy to find a practicable and feasible alternative.

by the term "law of the land" in Article I, Section 8.

The Superior Court's decision to affirm DelDOT's finding of necessity is not supported by the record and is not the product of a logical deductive process. DelDOT's condemnation of the Cannon's additional land was both legally erroneous and constituted an abuse of the sovereign power of eminent domain. Therefore, we respectfully dissent.